

**IT IS ORDERED as set forth below:**


**Date: March 14, 2017**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| STEVEN FORREST KOHLER | ) | |
| and ELIZABETH ANN KOHLER, | ) | CASE NO. 12-24328-JRS |
| | ) | |
| Debtors. | ) | |

_____

| | | |
|---|---|---|
| DIRK VAN PETEGHEM and | ) | |
| MIA-FRANCESCA VAN PETEGHEM, | ) | |
| | ) | ADVERSARY PROCEEDING |
| Plaintiffs, | ) | |
| | ) | CASE NO. 13-02026-JRS |
| v. | ) | |
| | ) | |
| STEVEN FORREST KOHLER | ) | |
| and ELIZABETH ANN KOHLER, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

### I.    Introduction

The issue before the Court is whether the Plaintiffs, the Van Peteghems, are entitled to a

judgment as a matter of law that a $250,500 jury verdict and resulting judgment in the Superior

Court of Forsyth County, Georgia,[1] in their favor against the Debtors, the Kohlers, for trespass, nuisance, defamation, destruction of timber and vegetation, assault and battery, vandalism and destruction of personal property, invasion of privacy (intrusion upon seclusion), and intentional infliction of emotional distress is non-dischargeable under 11 U.S.C. § 523(a)(6) based on the principles of res judicata and collateral estoppel because the injuries inflicted upon them were willful and malicious.

Currently before the Court is the Van Peteghems' Motion for Summary Judgment [Doc. 34]. They argue the jury verdict and resulting judgment are preclusive in this proceeding, entitling them to a judgment of non-dischargeability as a matter of law. The Kohlers oppose summary judgment on the grounds that the verdict is too ambiguous to be given preclusive effect and that willful and malicious states of mind were not necessary to a finding of liability for any of the Van Peteghems' claims.

The record from the proceeding in the Superior Court includes the trial transcript (including copies of the exhibits submitted into evidence),[2] the jury verdict,[3] the final judgment,[4] the Kohlers' complaint,[5] and the Van Peteghems' answer and counterclaims.[6]

Additionally, in opposition to summary judgment, the Kohlers have filed with the Court 24 exhibits (labeled Exhibits A through X) [Doc. 55] and four affidavits [Docs. 57–60]. The Court did not consider the exhibits and affidavits in ruling on this Motion for Summary Judgment. As explained more in depth later, the ultimate issue on this Motion for Summary Judgment is whether

---

[1] *Steven F. Kohler and Elizabeth Kohler v. Dirk Van Peteghem and Mia-Francesca Van Peteghem*, Case No. 10-cv-1737, Superior Court of Forsyth County, Georgia (hereinafter the "Superior Court Action").
[2] Doc. 36, Parts 1–10.
[3] Doc. 37, Part 2 (hereinafter the "Verdict").
[4] Doc. 46 (hereinafter the "Final Judgment").
[5] Doc. 37, Part 4.
[6] Doc. 37, Part 3.

and to what extent the Verdict and Final Judgment establish liability for a willful and malicious injury. The Court must determine that issue by looking only at the Verdict, the Final Judgment, and the record on which they were based. To the extent the Verdict and Final Judgment establish liability for a willful and malicious injury, the Kohlers are precluded from relitigating—i.e., submitting additional evidence on—the willful and malicious nature of the injury.

     For the reasons given below, the Court will grant in part and deny in part the Van Peteghems' Motion for Summary Judgment.

## II.  Background of Dispute[7]

### A.    Events Leading up to the Superior Court Action

In or around April 2007, the Van Peteghems moved next door to the Kohlers in the Grand Cascades subdivision in Suwanee, Georgia. They shared a property line that extended from the street in front of their houses back to the Chattahoochee River.[8] The parties were more or less friendly, without any major disputes, until the Van Peteghems began refurbishing their backyard in early March 2009.[9] The Van Peteghems intended for this yardwork to beautify their yard and make it safer for their children to play in.[10]

Before beginning the yardwork, Mrs. Van Peteghem discussed the planned work with the Forsyth County Department of Engineering. She spoke to the Department of Engineering's senior inspector, Simon Wilkes, who confirmed that no permits were needed for the project and that the

---

[7] Unless otherwise indicated, the information in this section is based on admissions in this proceeding or on uncontested or unrebutted testimony from the Superior Court Action.
[8] Pls.' Compl. [Doc. 1] ¶¶ 4, 9; Debtors' Answer [Doc. 5] ¶¶ 4, 9. Trial Tr. 1055:2–17 (direct examination and testimony of Mrs. Van Peteghem).
[9] Trial Tr. 384:13–25 (direct examination and testimony of Mrs. Kohler).
[10] Trial Tr. 724:8–724:22 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1056:20–23 (direct examination and testimony of Mrs. Van Peteghem).

work would be outside of the Chattahoochee River's protected buffer zone.[11] Mrs. Van Peteghem then requested that the Department of Engineering physically inspect the property. The department sent field engineer Tim Allen to inspect the property. He determined that the intended work complied with all county ordinances.[12] The work began on March 4, 2009, and lasted until March 10, 2009.[13]

At trial, the parties gave conflicting testimony regarding their discussions about the yardwork while the work was ongoing. Mr. Van Peteghem testified to the following. On March 9, Mrs. Kohler approached Mr. Van Peteghem and a yard worker and stated she had concerns about the Van Peteghems' yard project. Mr. Van Peteghem responded he did not think the yardwork would create problems for the Kohlers and invited Mrs. Kohler to inspect the work. Mrs. Kohler turned around and went into her house. Mr. Van Peteghem, surprised by Mrs. Kohler's reaction, told Mrs. Van Peteghem about the exchange. The Van Peteghems then made a phone call to the Kohlers. The Kohlers did not answer the phone. Mrs. Van Peteghem left a voice mail. The Kohlers did not return the phone call.[14]

Mrs. Kohler testified she did not remember that exchange with Mr. Van Peteghem or receiving a phone call or voice mail from the Kohlers.[15] Rather, she testified, the only conversation about the work took place before the work began. In this conversation, the Van Peteghems indicated "they were going to move some shrubbery around," and the Kohlers indicated they had no problem with the work as long as the Van Peteghems did not affect a drainage swale in the easement between the properties.[16]

---

[11] Trial Tr. 1061:9–22.
[12] Trial Tr. 1061:24–1062:20.
[13] Trial Tr. 1063:7–9.
[14] Trial Tr. 743:10–745:12 (direct examination and testimony of Mr. Van Peteghem).
[15] Trial Tr. 562:24, 564:1–19 (cross examination and testimony of Mrs. Kohler).
[16] Trial Tr. 563:19–24 (testimony of Mrs. Kohler).

It is undisputed that aside from the above, the Kohlers did not otherwise attempt to discuss their concerns about the yardwork with the Van Peteghems.[17]

On March 10, Mr. Kohler complained to William Patrick "Bill" Bridges—the Grand Cascades Community Association [hereinafter, "HOA"] president—that the Van Peteghems' yardwork violated various HOA covenants, such as clear cutting. Mr. Bridges met with the Kohlers that day to discuss the allegations. The Kohlers stated that the Van Peteghems' yard work would increase water runoff into the Kohlers' property. The Kohlers also alleged that the Van Peteghems were installing solar water heating, filling a ditch with top soil, and having work done to a septic system. Mr. Bridges met with the Van Peteghems on March 12 to discuss the Kohlers' claims and to take pictures of the yardwork.   Upon inspection, Mr. Bridges saw no problems with the yardwork and did not agree that the yardwork would redirect the natural flow of water.[18] He thereafter emailed Mr. Kohler to advise him that no HOA covenants had been violated and that he did not see or anticipate any damage to the Kohlers' property resulting from the yardwork.[19]

At or around the same time, Mr. Kohler also complained to Forsyth County about potential county ordinance violations, causing the county to send Mark Robert Zimmerman—a county soil erosion inspector—to the Van Peteghems' property.  Mr. Zimmerman inspected the property on March 11 and found nothing wrong, other than that the Van Peteghems needed to either put down mulch or install a silt fence. Mrs. Van Peteghem told Mr. Zimmerman she would comply. Mr.

---

[17] Trial Tr. 566:6–567:5 (cross examination and testimony of Mrs. Kohler).
[18] Trial Tr. 892:3–896:7 (direct examination and testimony of Bill Bridges).
[19] Trial Tr. 901:6–13 (direct examination and testimony of Bill Bridges).

Zimmerman then talked to Mr. Kohler about his findings. Mr. Kohler was disappointed that Mr. Zimmerman had not found more. [20]

Mr. Zimmerman inspected the Van Peteghems' property again on March 12 in response to Mr. Kohler's concern that the Van Peteghems had violated a county ordinance regarding removal of tree stumps. Mr. Zimmerman left Mr. Kohler a voicemail stating he found no violation. During the March 12 inspection, Mrs. Van Peteghem told Mr. Zimmerman that the Kohlers had existing major erosion issues and that she wanted the issues noted in case Mr. Kohler tried to blame the erosion on the Van Peteghems.[21] In response, Mr. Zimmerman took several photographs of the Kohlers' property, including photographs of damp areas. Mr. Zimmerman's field report noted the areas were damp despite no recent rain, due to the areas being in a low spot with a lot of tree cover.[22]

By the time Mr. Zimmerman made this March 12 visit, the Van Peteghems had already installed a silt fence to address the issues raised the previous day.[23]

The next day, on March 13, Mr. Zimmerman went back to the Van Peteghems' property with his supervisor Simon Wilkes. The supervisor inspected the property and determined that no permit was required for the yard work. Mr. Zimmerman concluded that the yard work should not adversely affect the Kohlers' property.[24]

March 13, 2009 was a key date in this dispute. Mr. Zimmerman, Mr. Wilkes, and Mr. Bridges were at the Van Peteghems' residence inspecting the yard work. Mrs. Van Peteghem was at the house; Mr. Van Peteghem was not.  Mr. Kohler angrily discussed the yardwork with Messrs. Zimmerman, Wilkes, Bridges, and Mrs. Van Peteghem. Mr. Kohler berated everyone present,

---

[20] Trial Tr. 942:10–944:8 (direct examination and testimony of Mark Zimmerman).
[21] Trial Tr. 944:9–945:13 (direct examination and testimony of Mark Zimmerman).
[22] Trial Tr. 946:20–947:20 (direct examination and testimony of Mark Zimmerman).
[23] Trial Tr. 947:25–948:7 (direct examination and testimony of Mark Zimmerman).
[24] Trial Tr. 941:10–11, 942:3–949:25 (direct examination and testimony of Mark Zimmerman).

including laborers in the yard. Mr. Kohler disputed the conclusions of Mr. Bridges, Mr. Zimmerman, and Mr. Wilkes that the Van Peteghems had done nothing wrong. Mr. Kohler yelled at Mr. Wilkes, insisting that Mr. Wilkes' conclusions were wrong. Mr. Kohler was adamant that the Van Peteghems had violated the law and HOA covenants. He continued accusing the Van Peteghems of various things, such as cutting down 60 trees the previous weekend and covering all the tree stumps, ruining the Kohlers' yard and septic system, and dumping silt into the Chattahoochee River. Mrs. Van Peteghem invited Mr. Kohler to inspect her yard to look for tree stumps. Mr. Kohler refused, stating he would not give Mrs. Van Peteghem the satisfaction. Mr. Kohler at one point said he would sue the Van Peteghems, the county, and the HOA for a million dollars a day. Mrs. Van Peteghem pleaded with Mr. Kohler, saying she wanted to try to work out Mr. Kohler's concerns, and stating she did not understand why he was making the numerous allegations.  During the exchange, Mr. Kohler got close in proximity with Mrs. Van Peteghem, shouting and shaking his finger at her, his face red with anger. Some of Mr. Kohler's saliva ejected from his mouth and landed on Mrs. Van Peteghem. Mrs. Van Peteghem was six-and-a-half-months pregnant at the time.[25]

At some point during this incident, Mr. Kohler went inside his house and called the police, stating that he felt threatened by Mrs. Van Peteghem.[26] The police calmed the situation with no one arrested.[27] At the suggestion of the officer on the scene, the Van Peteghems sent and emailed the

---

[25] Trial Tr. 1074:8–1084:22 (direct examination and testimony of Mrs. Van Peteghem); Trial Tr. 901:20–907:12 (direct examination and testimony of Bill Bridges); Trial Tr. 950:4–954:13 (direct examination and testimony of Mark Zimmerman). Mrs. Kohler was not home at the time and did not witness the incident. Trial Tr. 553:3–10, 555:25–556:1 (cross examination and testimony of Mrs. Kohler).
[26] Trial Tr. 953:5–10 (direct examination and testimony of Mark Zimmerman); Trial Tr. 1083:8–11 (direct examination and testimony of Mrs. Van Peteghem).
[27] Trial Tr. 907:9–12 (direct examination and testimony of Bill Bridges); Trial Tr. 1158:5–19 (cross examination and testimony of Mrs. Van Peteghem).

Kohlers a letter advising them not to contact the Van Peteghems or trespass on the Van Peteghems' property.[28]

It is undisputed that beginning around that time, the Kohlers began taking photographs and making recordings. At the trial in the Superior Court, the parties did dispute the number, frequency, and intent of the pictures and recordings.

The Van Peteghems testified in the Superior Court Action that the Kohlers recorded and took pictures of the Van Peteghems incessantly over several years from different angles and vantage points to get around the Van Peteghems' privacy measures, regardless of weather or circumstances. They testified that the Kohlers would film the Van Peteghems playing in the yard with their children and doing normal work around the yard, such as composting and installing a fence; film visitors, such as child playdates and family friends; and film special occasions, such as birthday parties and Easter egg hunts. The Van Peteghems testified the Kohlers took pictures and recordings of hired laborers. The Van Peteghems testified to an occasion when Mr. Van Peteghem was working on a fence near the parties' property line, and Mrs. Kohler put a camera close to Mr. Van Peteghem's face, took hundreds of pictures, and eventually retrieved a video camera and filmed Mr. Van Peteghem until he left the yard.[29]

Mrs. Kohler testified[30] that the Kohlers took pictures of and recorded what they perceived to be damage to their property, as it was occurring, such as water coming under their fence during

---

[28] Trial Tr. 1085:9–1086:3 (direct examination and testimony of Mrs. Van Peteghem); Trial Tr. 751:2–18 (direct examination and testimony of Mr. Van Peteghem); Kohlers' Trial Exhibit 28 [Doc. 36, part 11, page 65] (copy of the letter).

[29] Trial Tr. 747:23–748:6, 748:21–749:8, 752:17–20, 778:15–780:4, 795:15–24, 806:3–810:3 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1084:23–1085:8, 1087:8–1090:17, 1096:23, 1113:12–1115:4, 1133:13–19, 1137:9–1138:18 (direct examination and testimony of Mrs. Van Peteghem).

[30] Mr. Kohler did not testify at trial.

heavy rain events.[31] She testified the Kohlers had no intent to pry into the Van Peteghems' affairs.[32]
She claimed they never intended to film any of the Van Peteghems' children.[33] Mrs. Kohler testified
about two instances when she was recording runoff on her property, saw a camera pointed at her
from the Van Peteghems' house, and attempted to record the camera. In one instance, a smiling Mrs.
Van Peteghem jumped out of way of the recording, resulting in one of the Van Peteghems' children
being recorded by Mrs. Kohler.[34] Mrs. Kohler testified she panned the camera away immediately. In
the other instance, Mrs. Kohler testified that she noticed a camera poking out between closed blinds,
and when she attempted to record the camera, she instead found herself recording the inside of the
Van Peteghems' bathroom.[35] Mrs. Kohler testified "maybe" she "was being set-up" during these
incidents.[36]

In discovery in the Superior Court Action, the Kohlers produced approximately 600
photographs and 11 hours of recordings.[37] Mr. Van Peteghem testified that the Kohlers "absolutely"
did not produce every recording and photograph.[38] Mrs. Van Peteghem testified that "[n]ot even a
small fraction of that film has been produced."[39]

The filming and photographs were a part of what the Van Peteghems claimed was a multi-
year campaign of harassment and intimidation by the Kohlers that also included numerous false
accusations made to various people and entities. The Van Peteghems testified that the Kohlers made

---

[31] Trial Tr. 420:7–23 (direct examination and testimony of Mrs. Kohler).
[32] Trial Tr. 420:24–421:5 (direct examination and testimony of Mrs. Kohler).
[33] Trial Tr. 421:21–422:2 (direct examination and testimony of Mrs. Kohler).
[34] Trial Tr. 422:8–23 (direct examination and testimony of Mrs. Kohler).
[35] Trial Tr. 421:9–16 (direct examination and testimony of Mrs. Kohler).
[36] Trial Tr. 422:25–423:2 (testimony of Mrs. Kohler); Trial Tr. 1204:2 (rebuttal testimony of Mrs. Kohler).
[37] Trial Tr. 806:17–22 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 422:3–4 (testimony of
Mrs. Kohler).
[38] Trial Tr. 807:15–808:6 (direct examination and testimony of Mr. Van Peteghem).
[39] Trial Tr. 1089:6–7 (direct examination and testimony of Mrs. Van Peteghem).

false allegations to neighbors, Forsyth County, the Upper Chattahoochee River Keeper, the Georgia Department of Natural Resources, and the Georgia Mountains Regional Commission, among others. Among the allegedly false accusations were that the Van Peteghems were dumping silt into the Chattahoochee River, were deforesting the river bank, had collapsed the riverbank, had polluted the Chattahoochee River with copper, were building structures within the Chattahoochee River's protected buffer zone, and had a septic system that was making the Kohlers' home uninhabitable.[40] Another allegedly false accusation, which will be discussed more in depth later, was that the Van Peteghems had augured through and damaged the storm water drainpipe that ran between the parties' properties.[41]

The campaign of harassment also included the Kohlers' redirecting the natural flow of water back onto the Van Peteghems' property,[42] intimidating household guests by staring at them as they waited at the Van Peteghems' front door and by writing down their license plate information,[43] and destroying property markers.[44]

The Van Peteghems testified they took various measures to increase their privacy in the face of the Kohlers' campaign of harassment, all of which proved fruitless. The Van Peteghems testified that the constant photographs and recordings prompted them to install a privacy fence and to plant Leyland cypresses along the fence for additional privacy.[45] Mr. Kohler, however, would simply take

---

[40] Trial Tr. 1115:3–1118:17 (direct examination and testimony of Mrs. Van Peteghem); Trial Tr. 804:4–805:9 (direct examination and testimony of Mr. Van Peteghem).

[41] Trial Tr. 804:3–805:6 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 961:9–964:14 (direct examination and testimony of Forsyth County employee Mark Zimmerman).

[42] Trial Tr. 732:3–733:21, 736:20–737:8 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1090:21–1091:10, 1093:6–8 (direct examination and testimony of Mrs. Van Peteghem).

[43] Trial Tr. 1095:25–1096:18 (direct examination and testimony of Mrs. Van Peteghem).

[44] Trial Tr. 800:6–800:22 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1090:9–11 (testimony of Mrs. Van Peteghem).

[45] Trial Tr. 748:24–749:8, 749:20–22 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1086:14–1087:15 (direct examination and testimony of Mrs. Van Peteghem).

pictures and record from different vantage points and heights—he would prop himself up and reach a camera over the privacy fence, or he would use a camera from his deck, or he would use a camera from another neighbor's deck, or he would use a camera from a ladder he placed in the woods.[46] Additionally, the Kohlers placed a telescope on their deck pointed towards the Van Peteghems' yard.[47]

The Van Peteghems testified to attempts to reconcile with the Kohlers and to address the Kohlers' concerns about increased water runoff, which likewise proved fruitless. On one day a year or so into the dispute, Mrs. Van Peteghem saw Mrs. Kohler outside and approached her with a beverage, stating the Van Peteghems were willing to listen to the Kohlers' concerns. Mrs. Kohler silently and angrily glared at Mrs. Van Peteghem. Mrs. Van Peteghem returned to her house.[48] This episode appears to be the only attempt by either party to discuss the Kohlers' concerns, outside of the Van Peteghems' attempts in early March 2009 while the Van Peteghems' yardwork was ongoing.

The Van Peteghems testified they took steps to *improve* drainage and *decrease* runoff onto the Kohlers' property. That testimony is supported by the testimony of their expert witness and of the person hired to improve drainage and decrease runoff.[49] The Kohlers generally disputed that the Van Peteghems did anything that helped. Mrs. Kohler testified that everything the Van Peteghems did in their backyard seemed to make the runoff worse. She also testified the Kohlers waited as long as

---

[46] Trial Tr. 779:8–19, 807:8–15 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1085:2–4, 1087:8–1088:15 (direct examination and testimony of Mrs. Van Peteghem).
[47] Trial Tr. 1088:16–20 (direct examination and testimony of Mrs. Van Peteghem).
[48] Trial Tr. 1168:13–1169:8 (cross examination and testimony of Mrs. Van Peteghem).
[49] Trial Tr. 790:5–17 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1011:10–17 (direct examination and expert testimony of Phillip Craig); Trial Tr. 864:16–869:25 (direct examination and testimony of Matthew Gravitt).

they did to file suit, in part, because they had hoped to work things out despite the Van Peteghems' unwillingness to communicate with the Kohlers.[50]

### B.    Superior Court Action

On August 9, 2010, the Kohlers commenced the Superior Court Action by filing a complaint seeking damages against the Van Peteghems for public nuisance, private nuisance, and breach of legal duty for violating the Metropolitan River Protection Act ("MRPA"), O.C.G.A. §§ 12–5–440 to –457. The Kohlers alleged that the Van Peteghems "performed grading, grubbing, and clearing work … in excess of the legally permitted land disturbance on the tract," that the Van Peteghems' "grading … redirected water flow … on to the [Kohlers'] Property, caused siltation of the river, and has caused erosion," and that the Van Peteghems "failed to follow the conditions under the MRPA restricting clearing within the river protection corridor for the MRPA zone in which the [Van Peteghems' property] is located."[51]

The Van Peteghems counterclaimed for trespass, nuisance, defamation, destruction of timber and vegetation, assault and battery, vandalism and destruction of personal property, invasion of privacy (intrusion upon seclusion), and intentional infliction of emotional distress.[52] The trespass claim was based on the Kohlers personally entering onto the Van Peteghems' property on several occasions and on the Kohlers redirecting the natural flow of water onto the Van Peteghems' property.[53] The nuisance claim was based on the Kohlers generally disturbing the Van Peteghems' peace and quiet enjoyment of their property.[54] The defamation claim was based on the Kohlers' false

---

[50] Trial Tr. 405:12–17; 411:18–23 (direct examination and testimony of Mrs. Kohler).
[51] Complaint for Nuisance and Other Relief [Doc. 34, Part 5] ¶¶ 9–11.
[52] Answer of Defendants to Plaintiffs' Complaint for Nuisance and Other Relief and Counterclaim of Defendants [Doc. 34, Part 4], ¶¶ 74–138.
[53] *Id.* ¶ 84.
[54] *Id.* ¶ 91.

statements about the Van Peteghems to neighbors, county officials, the HOA, and various other entities.[55] The claim for destruction of timber and vegetation was based on the damage caused by the Kohlers' trespasses.[56] The assault claim was initially based on the Kohlers' alleged violent outbursts and angry gestures directed at both of the Van Peteghems.[57] As tried and sent to the jury, the assault claim was limited to the March 13, 2009 incident involving Mr. Kohler and Mrs. Van Peteghem. The battery claim also stemmed from that incident; specifically, Mrs. Van Peteghem alleged that Mr. Kohler's spit landing on her constituted battery.[58] The claim for vandalism and destruction of personal property was based on the Kohlers destroying official property survey markers.[59] The claim for invasion of privacy was based on the Kohlers intruding on the Van Peteghems' seclusion through "unreasonable surveillance"—i.e, the recordings and pictures.[60] The claim for intentional infliction of emotional distress was based on the Kohlers' actions amounting to a campaign of harassment intended to psychologically harm the Van Peteghems.[61]

The trial in the Superior Court Action took place the week of December 10, 2012. Mrs. Kohler was the sole testifying witness for the Kohlers' case-in-chief.[62] As summarized by the Court

---

[55] *Id.* ¶¶ 101–102.
[56] *Id.* ¶ 110.
[57] *Id.* ¶ 117.
[58] *Id.* ¶ 119.
[59] *Id.* ¶ 134.
[60] *Id.* ¶ 128.
[61] *Id.* ¶ 75–76.
[62] The Kohlers had intended to call as a witness a representative of the Georgia Mountains Regional Commission ("GMRC") to testify about the MPRA. The Kohlers, however, did not identify the GMRC representative as an expert to be used at trial until November 16, 2012, and the Kohlers did not provide a summary of the expected testimony to the Van Peteghems until two days before trial. Per a prior order, experts to be used at trial were to be identified by July 30, 2011, and were to be made available for deposition by October 15, 2011. On the Van Peteghems' motion, the trial court excluded the GMRC representative as an expert witness. *See* Trial Tr. 16:23–17:24, 22:11–17 (motion in limine and argument by Van Peteghems' counsel); Trial Tr. 29:17–21 (statement by Kohlers' counsel that the GMRC representative was the only one out of four identified experts he intended to have testify); Trial Tr. 30:19–31:9 (summary by Kohlers' counsel of GMRC representative's expected testimony); Trial Tr. 331:18–19 (oral ruling excluding GMRC representative from testifying); *Kohler v. Van Peteghem*, 330 Ga. App. 230, 232–33 (2014) (summarizing the motion and ruling).

of Appeals of Georgia (in an opinion discussed later), "She testified that the landscaping work in the Van Peteghems' backyard had caused a major increase in water runoff onto the Kohlers' property, resulting in soil erosion, the growth of a large 'chasm' in the wooded area of their property near the Chattahoochee River, and a substantial drop in the resale value of their property. The Kohlers also introduced photographs and video recordings that they had made in an effort to show the drainage problems caused by the Van Peteghems' landscaping work." *Kohler v. Van Peteghem*, 330 Ga. App. 230, 233, 767 S.E.2d 775, 778 (2014).

When the Kohlers rested their case, the Van Peteghems moved for a directed verdict on the MPRA claim, arguing the Kohlers presented no evidence of what the MRPA is or whether it had been violated, and arguing that the MRPA does not create a private cause of action.[63]  The court granted the motion and directed a verdict in favor of the Van Peteghems on the MRPA claim.[64]

The Van Peteghems, in their defense and case-in-chief, testified to the matters addressed in the previous section. In short, the Van Peteghems testified to the nature and scope of their yardwork, and they denied that their yardwork violated any code or ordinance, caused the Kohlers any damage, or exacerbated any existing runoff and drainage issues. The Van Peteghems also testified to the deterioration of the parties' relationship and to the parties' behavior thereafter. The Van Peteghems introduced several supporting witnesses, whose testimony is summarized below.

**Phillip Craig**

The Van Peteghems called Phillip Craig, a forensic engineer, as an expert witness. Mr. Craig testified that the Kohlers' drainage problems and yard condition (i.e., the large chasm in their yard)

---

[63] Trial Tr. 682:9–684:2, 695:5–696:21 (oral motion for directed verdict and argument in support by Van Peteghems' counsel).
[64] Trial Tr. 774:1–775:11 (oral ruling on motion for directed verdict).

were caused naturally, resulting from the drainage pipe between the parties' property and from the land topography.[65] For example, he testified that the Kohlers' property was the low point in neighborhood—the property received water runoff from several surrounding properties, in addition to water from the drainage pipe.[66] Moreover, he testified that the hole on Kohlers' property was a naturally occurring phenomenon along the Chattahoochee River.[67] Mr. Craig saw nothing to suggest the Van Peteghems' yardwork increased water runoff to the Kohlers' property.[68]

In fact, Mr. Craig testified that the Van Peteghems did various things that *decreased* runoff to the Kohlers' property, such as installing a dry creek bed and installing a 2,100-gallon rain water storage tank.[69] Moreover, he testified that the Kohlers' installation of rocks, mondo grass, and edging redirected the natural flow of water back onto the Van Peteghems' property.[70]

### William Bridges and Mark Zimmerman

William Bridges was the president of the parties' HOA in March 2009. Mark Zimmerman was a Forsyth County soil inspector who inspected the Van Peteghems' property several times. Both Mr. Bridges and Mr. Zimmerman became involved as a result of the Kohlers' March 2009 complaints about the Van Peteghems' yardwork. Each generally testified that after investigating the complaints, it was determined that the Van Peteghems had done nothing wrong, and the Kohlers were told as much.[71]

---

[65] *See generally* Trial Tr. 1001:7–1011:9; 1014:4–17.
[66] Trial Tr. 1001:7–22, 1008:8–1009:9.
[67] Trial Tr. 995:22–996:10.
[68] Trial Tr. 1014:4–11.
[69] Trial Tr. 1011:10–1012:10.
[70] Trial Tr. 1012:18–1013:1.
[71] Trial Tr. 901:8–13, 904:12–14, 905:5–8 (direct examination and testimony of Mr. Bridges); Trial Tr. 944:22–25, 949:16–19 (direct examination and testimony of Mr. Zimmerman).

Mr. Bridges testified that the Kohlers' grievances were numerous and that many of them were exaggerative or untrue,[72] that the Van Peteghems had done everything they could do to be compliant,[73] that Mrs. Van Peteghem had been reasonable and neighborly in attempting to address the Kohlers' complaints,[74] that the Van Peteghems had not violated any HOA rules,[75] that he did not see any damage to the Kohlers' property and did not anticipate any,[76] and that he had seen nothing the Van Peteghems did that would have impacted the Chattahoochee River.[77] He also testified that Kohlers' house is at a low point with houses uphill on both sides.[78]

Mr. Zimmerman visited the Van Peteghems' property eleven times between March 11, 2009 and April 23, 2010, primarily to identify any silt problems as the Van Peteghems' newly laid topsoil germinated new grass. He found no problems other than the need for a silt fence, which as noted above, the Van Peteghems installed within a day of Mr. Zimmerman saying the fence was required.

Mr. Zimmerman testified that during his visit on March 12, 2009, he observed damp areas in low spots on the Kohlers' property despite no recent rain, due to the property being in a low spot with a lot of tree cover.[79] He also testified that the Van Peteghems' installation of a dry creek bed should have mitigated the natural runoff onto the Kohlers' property.[80]

Mr. Zimmerman's testimony corroborated the Van Peteghems' unrebutted testimony that the Kohlers falsely accused the Van Peteghems of damaging the drainage pipe that runs between the parties' properties. During Mr. Zimmerman's visit to the Van Peteghems' property on April 28, 2009,

---

[72] Trial Tr. 909:20–910:1.
[73] Trial Tr. 907:18–19.
[74] Trial Tr. 912:5–17.
[75] Trial Tr. 901:8–13.
[76] Trial Tr. 901:8–13.
[77] Trial Tr. 911:21–24.
[78] Trial Tr. 897:8–12.
[79] Trial Tr. 947:13–20.
[80] Trial Tr. 966:7–967:16.

Mr. Kohler told Mr. Zimmerman that Mr. Van Peteghem had augured through the drainage pipe. Mr. Kohler said that this damage caused muddy storm water to discharge from the pipe.  Mr. Zimmerman investigated the accusations at that moment. He observed no muddy discharge and saw nothing indicating anyone had augured through the drain pipe. Mr. Zimmerman wrote in his field notes on that day, and testified, that Mr. Van Peteghem's one-man augur was unlikely to make it through the corrugated-metal pipe.[81]

Mr. Zimmerman returned to the Van Peteghems' property on June 18, 2009 in response to another complaint by the Kohlers that Mr. Van Peteghem had augured through the same drainage pipe. Mr. Zimmerman and a Forsyth County storm water technician looked inside the pipe with a pipe camera and found no sign of damage. When Mr. Zimmerman reported his findings to Mr. Kohler, Mr. Kohler  responded that he had proof that the Van Peteghems had bored through the pipe and poured concrete into it. Mr. Zimmerman questioned him about the proof. Mr. Kohler eventually said he was not sure if the Van Peteghems had gone through the pipe, but they were close.[82]

Both Mr. Bridges and Mr. Zimmerman were eye-witnesses to the March 13, 2009, confrontation that resulted in Mr. Kohler's saliva landing on Mrs. Van Peteghem. Neither testified to seeing saliva land on Mrs. Van Peteghem, but both generally corroborated Mrs. Van Peteghems' testimony as to Mr. Kohler's behavior.

Mr. Bridges testified that both Mrs. Van Peteghem and Mr. Kohler were very frustrated during the incident. According to Mr. Bridges, Mrs. Van Peteghem felt she had done everything to comply with HOA rules and county law, while Mr. Kohler was adamant that HOA rules and the law had been violated (despite having been informed otherwise). Mr. Bridges testified that Mr. Kohler

---

[81] Trial Tr. 958:11–960:20.
[82] Trial Tr. 961:9–964:14.

was yelling, being unreasonable, made many accusations and that Mrs. Van Peteghem was crying during the incident.[83]

Mr. Zimmerman testified that, while inspecting the Van Peteghems' property on March 13, 2009 he and his supervisor Simon Wilkes determined that the Van Peteghems' yardwork did not require a permit and should not adversely affect the Kohlers' property. He testified that Mr. Kohler confronted and yelled at Mr. Wilkes, insisting that Mr. Wilkes's conclusions were wrong, and threatening to sue Forsyth County. Mr. Zimmerman also testified that Mr. Kohler shouted at Mrs. Van Peteghem and threatened to sue her, that Mr. Kohler's behavior toward Mrs. Van Peteghem was upsetting, and that Mr. Kohler called the police because he felt threatened by Mrs. Van Peteghem.[84]

### Matthew Gravitt

The Van Peteghems hired Matthew Gravitt to perform certain work in March and April 2010. Mr. Gravitt testified to the work done and what the work was intended to do.[85] He testified that the Van Peteghems wanted "to improve any surface water whatsoever" and to avoid water runoff onto the Kohlers' property.[86] Mr. Gravitt recommended that the Van Peteghems install a dry creek bed (or rock swale) and catch basin to keep the surface water going down the property line, and recommended a berm to channel water to the back of the property. The Van Peteghems implemented Mr. Gravitt's recommendations.[87]

Mr. Gravitt testified to a visit he made to the Kohlers' property on March 18, 2009, about a year earlier than he met with the Van Peteghems.[88] The Kohlers had told Mr. Gravitt's company that

---

[83] Trial Tr. 903:24–907:19.
[84] Trial Tr. 948:18–954:13.
[85] *See generally* Trial Tr. 859:6–869:25.
[86] Trial Tr. 864:16–19, 868:13–869:25.
[87] Trial Tr. 864:19–23, 868:13–869:25.
[88] *See generally* Trial Tr. 870:1–886:22.

they began smelling sewage after the Van Peteghems performed yardwork. When Mr. Gravitt met with Mr. Kohler, Mr. Kohler asked if Mr. Gravitt saw anything illegal the Van Peteghems had done to cause sewage to come out; Mr. Kohler stated he thought the sewage smell came from the Van Peteghems' yard as a result of grading done to the yard.[89] Mr. Gravitt stated he saw nothing illegal but advised that he was not a county health inspector.[90]

Mr. Gravitt inspected the Kohlers' property during this visit. He observed that the Kohlers' septic drain field was saturated, that the septic drain field was at the lowest part of the Kohlers' property, and that Kohlers' property was the "low man on the totem pole" getting water from surrounding properties. He testified that septic drain fields are designed for an amount of water used in a house, rather than Mother Nature's water from numerous properties.[91] He recommended several ways to address the saturated drain field.[92] Mr. Kohler declined Mr. Gravitt's services.[93]

Mr. Gravitt characterized Mr. Kohler's statements as "trying to blame" the Van Peteghems for the Kohlers' problems.[94]

## C.    The Verdict

On December 14, 2012, the jury in the Superior Court Action returned a verdict in favor of the Van Peteghems both on the Kohlers' claims and on the Van Peteghems' counterclaims for trespass, nuisance, defamation, destruction of timber and vegetation, assault, battery, vandalism and destruction of personal property, invasion of privacy, and intentional infliction of emotional distress. The trial court directed the battery verdict but the jury awarded the damages.

---

[89] Trial Tr. 871:17–20, 872:3–7, 873:14–15, 874:6–10.
[90] Trial Tr. 872:7–9.
[91] Trial Tr. 872:10–876:5.
[92] Trial Tr. 877:12–880:23.
[93] Trial Tr. 880:24–881:2.
[94] Trial Tr. 883:25–884:4.

The jury awarded the Van Peteghems $250,500, itemized as follows:

- $10,750 to Mrs. Van Peteghem against Mr. and Mrs. Kohler for trespass, nuisance, and destruction of property;
- $10,750 to Mr. Van Peteghem against Mr. and Mrs. Kohler for trespass, nuisance, and destruction of property;
- $5,375 to Mr. and Mrs. Van Peteghem against Mr. Kohler for slander per se;
- $5,375 to Mr. and Mrs. Van Peteghem against Mrs. Kohler for slander per se;
- $26,875 to Mr. and Mrs. Van Peteghem against Mr. Kohler for invasion of privacy;
- $26,875 to Mr. and Mrs. Van Peteghem against Mrs. Kohler for invasion of privacy;
- $21,500 to Mrs. Van Peteghem against Mr. Kohler for assault;
- $10,750 to Mrs. Van Peteghem against Mr. Kohler for battery;
- $48,375 to Mr. and Mrs. Van Peteghem against Mr. Kohler for intentional infliction of emotional distress;
- $48,375 to Mr. and Mrs. Van Peteghem against Mrs. Kohler for intentional infliction of emotional distress;
- $35,000 to Mr. and Mrs. Van Peteghem against Mr. and Mrs. Kohler for attorney fees and expenses; and
- $500 in punitive damages.

### D.    Post-verdict Procedural History

On December 20, 2012—after the verdict was returned but before the judgment was entered—the Kohlers filed their Chapter 7 bankruptcy petition.  On March 20, 2013, this Court entered an order modifying the automatic stay to allow entry of a final judgment in the Superior Court Action and to allow the parties to proceed with any post-trial motions and appeals. The Van Peteghems commenced this adversary proceeding on March 27, 2013. The Court stayed this proceeding until the Superior Court Action was fully resolved.

The Superior Court entered the Final Judgment [Doc. 46] on April 10, 2013. The Kohlers moved for—and were denied—a new trial. They then appealed denial of their motion for a new trial, arguing that the trial court erred in directing the verdicts on the MPRA claim and the battery counterclaim and erred in excluding an MPRA expert from testifying at trial.  On November 6, 2014, the Court of Appeals of Georgia reversed the battery directed verdict, but affirmed the Final

Judgment in all other respects. *See Kohler v. Van Peteghem*, 330 Ga. App. 230, 767 S.E.2d 775

(2014). The Kohlers appealed to the Supreme Court of Georgia, which denied certiorari on March 2,

2015. On June 3, 2015, the Van Peteghems voluntarily dismissed the battery counterclaim on

remand. The Final Judgment is now final and non-appealable.

With the Superior Court matters resolved and non-appealable, the Van Peteghems moved for

summary judgment in this adversary proceeding. [Doc. 37]. They argue that the judgment debt at

issue, as a matter of law, is a debt "for willful and malicious injury" under 11 U.S.C. § 523(a)(6) on

two grounds. First, they argue they "are entitled to summary judgment that the Kohlers' debt is non-

dischargeable under the doctrine of res judicata because a jury rendered a final verdict that the

Kohlers committed intentional torts with the specific intent to cause harm." Pls.' Mot. Summ. J. at 19

[Doc. 37 at 22]. Second, they argue they "are entitled to summary judgment that the Kohlers' debt is

non-dischargeable under the doctrine of collateral estoppel because a jury rendered a final verdict

that the Kohlers committed intentional torts with the specific intent to cause harm." Pls.' Mot.

Summ. J.  at 21 [Doc. 37 at 24].

The Kohlers filed a Response & Opposition to Plaintiffs' Motion for Summary Judgment

[Doc. 40], and a Supplemental Brief [Doc. 41]. In those documents, the Kohlers argue that summary

judgment is inappropriate for a number of reasons that can broadly be put into three categories: (1)

their actions were not willful and malicious; (2) the verdict is ambiguous and deficient; (3) none of

the torts for which they were found liable require willfulness and malice for liability to be imposed.

The Court entered an Order & Notice of Hearing on Plaintiffs' Motion for Summary

Judgment [Doc. 47] and focused the parties' attention on the issue of intent to harm; on the evidence

in the record regarding intent to harm; on the evidence submitted in the Superior Court Action on

intent to harm; and on whether—assuming the Court held a trial on the limited issue of intent to

harm—either party intends to rely on evidence not already in the record.  The Kohlers appeared at the hearing *pro se*.[95] The Van Peteghems appeared through counsel. The Court heard the parties' arguments and took the matter under advisement.

The Kohlers thereafter filed a Motion for Leave to File Post Hearing Brief and Post hearing Brief [Doc. 53] (hereinafter "Post Hearing Brief"), which the Court granted the next day [Doc. 54]. The Post Hearing Brief more narrowly focuses the Kohlers' arguments on intent to harm. The Court addresses their arguments below.

## III.    Law

### A.    Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* The Court "should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (citations and punctuation omitted).

### B.    Willful & Malicious Injury Under 11 U.S.C. § 523(a)(6)

Under § 523(a)(6), a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge. An injury is "willful" when the debtor

---

[95] The Kohlers originally had counsel in this proceeding. Their counsel, however, withdrew from representation after being appointed as a judge for the state court of DeKalb County. The Kohlers proceeded without since June 26, 2015.

"commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir. 1995)); *see also Tasker v. Sitton (In re Sitton)*, No. 14-5484-PWB, 2015 WL 1622032, at *1 (Bankr. N.D. Ga. Mar. 11, 2015) (Bonapfel, J.) ("Section 523(a)(6) requires that a debtor intend the injury, not just the act that causes the injury.") (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998)). An injury is "malicious" when the debtor's actions are "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *In re Jennings*, 670 F.3d at 1334 (quoting *In re Walker*, 48 F.3d at 1164). An injury caused negligently or recklessly is insufficient under § 523(a)(6). *Kawaauhau*, 523 U.S. at 64.

## C.    Collateral Estoppel[96]

"Collateral estoppel principles apply to dischargeability proceedings." *In re St. Laurent*, 991 F.2d 672, 675 (11th Cir. 1993) (citing *Grogan v. Garner,* 498 U.S. 279, 285 n.11 (1991)). "If the prior judgment was rendered by a state court, then the collateral estoppel law of that state must be applied to determine the judgment's preclusive effect." *Id.* at 675–76; *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").

---

[96] The Van Peteghems argue that they are entitled to summary judgment on res judicata grounds. *See* Pls.' Mot. Summ. J. at 19–21 [Doc. 37 at 22–24]. The Court dispenses with this argument here because lengthy consideration is unnecessary. Res judicata, or claim preclusion, "prevents the re-litigation of claims which have already been adjudicated, or which could have been adjudicated, between identical parties or their privies in identical causes of action." *Crowe v. Elder*, 290 Ga. 686, 688, 723 S.E.2d 428, 430 (2012). This proceeding involves, exclusively, a bankruptcy cause of action to determine non-dischargeability under 11 U.S.C. § 523(a)(6). The Superior Court Action involved, exclusively, state law tort matters. The causes of action are clearly not identical.

The Supreme Court of Georgia has explained collateral estoppel as follows:

> Collateral estoppel precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Collateral estoppel requires identity of the parties and their privies in both actions. However, collateral estoppel does not require precise identity of the claim—so long as an issue was determined in the previous action and there is identity of the parties or their privies, that issue may not be re-litigated, even as part of a different claim. Collateral estoppel not only precludes those issues that actually were litigated and decided in the previous action, it also precludes issues that necessarily had to be decided in order for the previous judgment to have been rendered.

*In re T.M.G.*, 275 Ga. 543, 544, 570 S.E.2d 327, 329 (2002) (footnotes omitted).

## IV.    Scope of Analysis

### A.    The Issue Before the Court Is Narrow, and the Court's Inquiry Is Limited

The Van Peteghems' motion for summary judgment is based solely on the preclusive effect of the Final Judgment. The narrow issue before the Court, therefore, is whether the Final Judgment is preclusive in this proceeding. If the Final Judgment establishes liability for a willful and malicious injury, the Final Judgment is entitled to preclusive effect, and summary judgment is appropriate. Conversely, summary judgment is not appropriate if the Final Judgment does not establish liability for a willful and malicious injury. The Court's inquiry, then, is limited to the matters actually or necessarily decided by the Final Judgment.

Ideally, the Court would have a final judgment that set out all of the issues decided.  The Court's task would be easier with such a final judgment because the Court would need only to rely on one document—the final judgment—to determine the issues decided and, therefore, to determine the judgment's preclusive effect.

But often, as is the case here, a judgment is a relatively short document stating only—in general terms and without identifying every issue decided—the outcome of the proceeding. In those

circumstances, courts can look behind the judgment to the prior case's record to determine what issues were actually or necessarily decided. *E.g.*,  *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451, 459 n.7 (5th Cir. 1971) ("It is established that in discovering what issues were determined by the judgment in a prior action, the court in the second action is free to go beyond the judgment roll and may examine the pleadings and the evidence in the prior action."); 18 MOORE'S FEDERAL PRACTICE  § 132.03[2][b] (Matthew Bender 3d ed.) (same); *Watergate at Landmark Condo. Unit Owners Ass'n v. Wauben (In re Wauban)*, 121 F.3d 702 (table), 1997 WL 436936, at *3 (4th Cir. Aug. 5, 1997) ("To decide whether such an issue was indeed determined in the prior action, a court may of course look to the pleadings and other materials of record in the prior action, and if those be inconclusive, to extrinsic evidence for further aid. Here, in deciding that the judgment was based on a finding of actual fraud, the bankruptcy court considered the pleadings, other materials in the state trial record, most critically the court's letter ruling imposing liability, and the comments made by Judge Kent in response to Watergate's post-judgment motion for clarification of the state judgment.").

Moreover, "[i]f it cannot be determined from the pleadings and other materials of record in the prior action what issues, if any, were litigated and determined by the verdict and judgment, extrinsic evidence is admissible to aid in such a determination." RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. f; *see also Dean v. Hunter (In re Hunter)*, 484 B.R. 721, 730–31 (Bankr. E.D. Tenn. 2012) (looking to state court judge's in-hearing handwritten notes to determine non-dischargeable portion of judgment).

B.    To Determine the Final Judgment's Preclusive Effect, the Court Cannot Consider Evidence that Could Have Been, But Was Not, Submitted in the Superior Court Action

The Kohlers submitted in this proceeding four affidavits: Affidavit of Steven F. Kohler [Doc. 57]; Affidavit of Thomas Kohler [Doc. 58] (the Kohlers' son); Affidavit of Elizabeth Ann Kohler [Doc. 59]; and Affidavit of Zena Johnston [Doc. 60] (friend/co-worker of Mrs. Kohler).

The Kohlers also submitted and 24 exhibits [Doc. 55], labeled Exhibits A through X. The exhibits are as follows:

- Exhibits A through C are the Verdict [Doc. 55, at 1–7], excerpts from the trial transcript [Doc. 55, at 8–61], and the Final Judgment Doc. 55, at 62–64];
- Exhibit D is a Title Insurance Certificate for the Kohlers' property, dated April 14, 1998 [Doc. 55, at 65–70];
- Exhibit E contains documents obtained on December 6, 2012, from the Forsyth County Department of Planning and Development [Doc. 55, at 71–74];
- Exhibit F contains excerpts from amendments, dated April 28, 2009 to the HOA's covenants [Doc. 55, at 75–82];
- Exhibit G is a cease and desist letter dated March 11, 2009 [Doc. 55 at 83–86];
- Exhibit H contains various documents from the Forsyth County Department of Engineering, dating between December 10, 2007 and July 11, 2012 [Doc. 55, at 87–106];
- Exhibit I contains audio recordings of phone calls made to the police between March 2009 and March 2010, and related documents [Doc. 55, at 107–113];
- Exhibit J is a letter from the Van Peteghems to the Kohlers dated March 13, 2009 [Doc. 55, at 114–116];
- Exhibit K is a Request for Modification Review dated March 14, 2009 [Doc. 55, at 117–122];
- Exhibit L is a Forsyth County Sheriff's incident report dated March 18, 2009 [Doc. 55, at 123–131];
- Exhibit M appears to be a Lowe's website printout of product information for a Severe Weather Pine Dog-Ear Pressure Treated Wood Fence Privacy Panel [Doc. 55, 132–134] (the Affidavit of Steven F. Kohler, at ¶ 23, indicates this exhibit relates to Mr. Kohler's accusation that the Van Peteghems polluted the Chattahoochee River with copper);
- Exhibit N contains county and state health department records dated between June 9, 1997 and March 18, 2010 [Doc. 55, at 135–140];
- Exhibit O contains an invoice dated October 13, 2010 from Akins Plumbing Inc. [Doc. 55, at 141–143];
- Exhibit P contains an invoice dated June 6, 2011 from a land survey company [Doc. 55, at 144–147];
- Exhibit Q contains a letter dated March 29, 2012 from the HOA's management agent [Doc. 55, at 148–150];

- Exhibit R contains excerpts from a legal article, published by a law firm, on boating torts [Doc. 55, at 151–154];
- Exhibit S contains a Westlaw printout for Georgia Suggested Pattern Jury Instructions – Civil § 66.711 ("Intent to Harm; Acting with") [Doc. 55, at 155–157];
- Exhibit T contains excerpts from Mrs. Kohler's diary, dated between March 13, 2009 and November 22, 2012 [Doc. 55, at 158–212];
- Exhibit U contains copies of aerial images, dated between 2009 and 2012, from the Forsyth County Geographic Information System Department [Doc. 55, at 213–218];
- Exhibit V contains an email dated March 23, 2009, from the Kohlers' Superior Court Action attorney [Doc. 55, at 219–221];
- Exhibit W contains numerous photographs and video captures, both dated and undated [Doc. 55, at 222–286];[97]
- Exhibit X is a newspaper clipping dated December 18, 2015, on Mrs. Kohler receiving the Green School Educator of the Year Award from Keep Forsyth County Beautiful [Doc. 55, at 287–289].

Summarized, the affidavits contain the Kohlers' "side" of the dispute. The affidavits (and accompanying exhibits) are used to support the Kohlers' contentions and argument that they acted at all times, not with willful and malicious intent, but to protect their property, their family, and the Chattahoochee River.[98] Therefore, they argue that summary judgment is inappropriate because intent is a disputed material fact.

The Kohlers' argument and submissions in this regard miss the point of the Van Peteghems' motion for summary judgment. The issue before the Court is whether the Final Judgment precludes the Kohlers from relitigating the issue of intent to injure. The Van Peteghems assert that the Final Judgment conclusively established "intent" for a willful and malicious injury, thereby rendering it a

---

[97] Of the dated photographs, the latest is from November 20, 2012. The Kohlers' affidavits do not refer to any photographs or video captures dated after November 20, 2012. Presumably, none of the photographs were taken after the trial in the Superior Court Action.

[98] Defs.' Resp. at 5–6 ("Further Kohlers assert that the Kohlers' actual actions in the underlying neighbor dispute were neither willful nor malicious …. The Defendants make their Statement of Facts in the following sections supported by Affidavits and Exhibits …. [T]o get a full understanding of each of the Kohlers [sic] observations and states of mind, Defendants respectfully request the Court to review the entire Affidavit of each Elizabeth Ann Kohler, Steven F. Kohler, and Thomas Kohler."); *see also, e.g.*, Defs.' Resp. at 13 ("Kohlers acted with the intent to protect their property, their family, and the River; not to intentionally cause harm to the Van Peteghems."); Post-hearing Br. at 3; Affidavit of Elizabeth Ann Kohler [Doc. 59] at ¶ 71; Affidavit of Steven F. Kohler [Doc. 57] at ¶ 20.

material fact that cannot be disputed in this proceeding.  Therefore, the question here is whether the record on which the Final Judgment was created supports that assertion.  In that light, the Kohlers' affidavits and exhibits are either redundant or irrelevant: redundant to the extent duplicative of evidence already in the trial court record; irrelevant in response to this Motion if not already in the trial court record because it is on that record that the debt was created and on which the preclusiveness of the Final Judgment must be determined.  Just as the Van Peteghems cannot submit additional materials not in the trial court record in support of their position that the Final Judgment is preclusive, the Kohlers cannot submit additional materials not in the trial court record to show the Final Judgment is not preclusive.  Basically, it is the record from the Superior Court that is on trial now in considering whether or not, or to what extent, the Final Judgment is preclusive with respect to the dischargeability of the debt created by that Final Judgment.

The Kohlers state that "[m]ost of the evidence" they submitted in this proceeding "was not used in the underlying jury trial, and some of the evidence is in fact new evidence come to light since trial." Defs.' Resp. at 4–5.[99] As to the evidence in existence at trial, "a party 'cannot avoid issue preclusion simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first.'" *Etowah Envtl. Grp., LLC v. Walsh*, 333 Ga. App. 464, 471, 774 S.E.2d 220, 226 (2015) (internal quotation marks omitted) (quoting *In re Sonus Networks, Inc. S'holder Derivative Litig.*, 422 F. Supp. 2d 281, 293 (D. Mass. 2006)); *see also* 18 MOORE'S FEDERAL PRACTICE § 132.02[2][d] (Matthew Bender 3d ed.) ("Evidence that is not the result of a different factual situation or changed circumstances, but is instead historical in nature and could have been admitted at the first trial if properly submitted, cannot be introduced in subsequent litigation of the

---

[99] Notably, and as discussed more in depth later, Mr. Kohler did not testify in the Superior Court Action.

same issue."); *cf. Am. States Ins. Co. v. Walker*, 223 Ga. App. 194, 196, 477 S.E.2d 360, 363 (1996) ("A prior judgment … does not prevent relitigating an issue if in the interim material facts have changed, altering the relations or rights of the litigants.").

As to the "new evidence come to light since trial," the obvious problem is that the Kohlers have submitted no new evidence "of a different factual situation or changed circumstances." 18 MOORE'S FEDERAL PRACTICE § 132.02[2][d]. The only new evidence is the newspaper article on Mrs. Kohler receiving the Green School Educator of the Year Award (Exhibit X). Mrs. Kohler having received that award is not a changed "material fact … altering the relations or rights" of the parties. *Am. States Ins. Co.*, 223 Ga. App. at 196, 477 S.E.2d at 363. Moreover, the Kohlers do not even rely on the award for any "changed facts" argument, and its relevance is unclear.[100]

For the above reasons, the Kohlers' affidavits and exhibits should not be considered in ruling on the Van Peteghems' motion. The Court will now turn to the merits.

## V.    Analysis

The Final Judgment is preclusive in this proceeding to the extent it establishes (1) an injury that is (2) willful and (3) malicious. The Court will address these elements.

### A.    Injury

The Final Judgment, on its face, imposes a $250,500 liability. That liability decreased by $10,750 upon reversal and remand of the battery directed verdict and its subsequent dismissal. The Final Judgment, therefore, imposes a total liability under Georgia law of $239,750. The existence

---

[100] The Affidavit of Elizabeth Ann Kohler, at ¶ 72, refers to Exhibit X after stating the following: "I am currently living in fear of what Mia Van Peteghem will do to denigrate me to my employer and anyone who knows me … after she finds out about my Keep Forsyth County Beautiful Green School Educator of the year award I received last month."

and amount of that liability are conclusively established and cannot be collaterally attacked in this proceeding.

The Kohlers, however, challenge the total amount of that liability. The Kohlers argue that the Verdict's "and/or" construction renders the liability imposed under the Verdict—and by extension the Final Judgment, which derives from the Verdict—ambiguous and deficient. Defs.' Resp. at 14–23. They argue this despite acknowledging that their "ability to challenge the verdict and judgment on the grounds of ambiguity and other deficiencies was waived when not raised at trial or on appeal in the Georgia action." Defs.' Resp. at 14 n.5. The Kohlers assert, however, "that the construction or interpretation of the verdict form and judgment for purposes of federal bankruptcy law is a new issue, and there has been no waiver." Defs.' Resp. at 14 n.5.

The Kohlers arguments on this point are both legally irrelevant and factually incorrect.

As a legal matter, "[t]he Full Faith and Credit Act, 28 U.S.C. § 1738 … requires the federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986)). This Court must treat the Final Judgment as would a non-federal Georgia court. The Final Judgment is enforceable under Georgia law in the amount of $239,750. The Van Peteghems' injury for purposes of this proceeding, therefore, is $239,750. The Kohlers cannot now, in this Court, challenge the validity or amount of that liability. This Court's job is to determine the nature of that liability—whether it was caused willfully and maliciously and, therefore, whether it is non-dischargeable.[101]

---

[101] The Court notes that that this proceeding was stayed for the specific purpose of completing the state court litigation, thereby determining the Kohlers' liability under Georgia law. As the Kohlers acknowledge, the Kohlers

Notwithstanding the above, the Court will address the merits of the Kohlers' argument that the Verdict is ambiguous. The Final Judgment itself, of course, is unambiguous. It states as follows:

> The Court enters judgment in favor of Dirk Van Peteghem against Steven F. Kohler and Elizabeth "Ann" Kohler jointly and severally in the amount of $10,750.[102]
>
> The Court enters judgment in favor of Mia-Francesca Van Peteghem against Steven F. Kohler and Elizabeth "Ann" Kohler jointly and severally in the amount of $10,750.[103]
>
> The Court enters judgment in favor of Mia-Francesca Van Peteghem against Steven F. Kohler in the amount of $32,250.[104]
>
> The Court enters judgment in favor of Mia-Francesca Peteghem and Dirk Van Peteghem against Steven F. Kohler in the amount of $80,625.[105]
>
> The Court enters judgment in favor of Mia-Francesca Peteghem and Dirk Van Peteghem against Elizabeth "Ann" Kohler in the amount of $80,625.[106]
>
> The Court enters judgment in favor of Mia-Francesca Peteghem and Dirk Van Peteghem against Steven F. Kohler and Elizabeth "Ann" Kohler jointly and severally in the amount of $35,500.[107]

The Kohlers argue, however, that "the Final Judgment does not necessarily follow from the verdict due to the verdict's ambiguity in liability and damages." Defs.' Resp. at 15. Specifically, the Kohlers argue that that the Verdict's use of "and/or" renders ambiguous and deficient the findings for slander per se, invasion of privacy, intentional infliction of emotion distress, and punitive damages. For slander per se, invasion of privacy, and intentional infliction of emotional distress, the Verdict form was written as follows:

---

did not raise the ambiguity issue with the Superior Court or with the Georgia Court of Appeals, despite having moved for a new trial and despite having appealed on several grounds.

[102] This corresponds to the jury's award of $10,750 in favor of Mr. Van Peteghem and against both Kohlers for trespass, nuisance, and destruction of property.

[103] This corresponds to the jury's award of $10,750 in favor of Mrs. Van Peteghem and against both Kohlers for trespass, nuisance, and destruction of property.

[104] This corresponds to the jury's awards of $21,500 and $10,750 in favor of Mrs. Van Peteghem's and against Mr. Kohler for, respectively, assault and battery.

[105] This corresponds to the jury's awards of $5,375, $26,875, and $48,375 in favor of the Van Peteghems and against Mr. Kohler for, respectively, slander per se, invasion of privacy, and intentional infliction of emotional distress.

[106] This corresponds to the jury's awards of $5,375, $26,875, and $48,375 in favor of the Van Peteghems and against Mrs. Kohler for, respectively, slander per se, invasion of privacy, and intentional infliction of emotional distress.

[107] This corresponds to the jury's awards of $35,000 and $500 in favor of the Van Peteghems and against both Kohlers for, respectively, attorney fees and punitive damages.

> We, the Jury, find for _____ Dirk Van Peteghem and/or _____ Mia-Francesca Van Peteghem on their claims for _____ against _____ Steven F. Kohler in the amount of $_____ .and/or _____ Elizabeth Ann Kohler in the amount of $_____ .

For each claim, the jury placed an "X" next to each of Dirk Van Peteghem, Mia-Francesca Van Peteghem, Steven F. Kohler, and Elizabeth Ann Kohler. Moreover, for each claim, the jury wrote the same dollar amount of liability for Steven F. Kohler and Elizabeth Ann Kohler. Thus, the Verdict looked as follows for slander per se, invasion of privacy, and intentional infliction of emotional distress:

> __X__    We, the Jury, find for __X__ Dirk Van Peteghem and/or __X__ Mia-Francesca Van Peteghem on their claims for **slander per se** against __X__ Steven F. Kohler in the amount of $ 5,375 .and/or __X__ Elizabeth Ann Kohler in the amount of $ 5,375 .

> __X__    We, the Jury, find for __X__ Dirk Van Peteghem and/or __X__ Mia-Francesca Van Peteghem on their claims for **invasion of privacy/intrusion upon seclusion** against __X__ Steven F. Kohler in the amount of $ 26,875 .and/or __X__ Elizabeth Ann Kohler in the amount of $ 26,875 .

> __X__    We, the Jury, find for __X__ Dirk Van Peteghem and/or __X__ Mia-Francesca Van Peteghem on their claims for **intentional infliction of emotional distress** against __X__ Steven F. Kohler in the amount of $~~48,375~~ .and/or __X__ Elizabeth Ann Kohler in the amount of $ ~~48,375~~ . 48,375 48,375

Additionally, the Verdict's section on punitive damages looked as follows:

> __X__    We, the Jury, find for __X__ Dirk Van Peteghem and/or __X__ Mia-Francesca Van Peteghem on their claims for **punitive damages** against __X__ Steven F. Kohler and/or __X__ Elizabeth Ann Kohler.

> __X__    We, the Jury, find that __X__ Steven F. Kohler and/or __X__ Elizabeth Ann Kohler (acted) or ~~failed to act~~ with the specific intent to cause harm to __X__ Dirk Van Peteghem and/or __X__ Mia-Francesca Van Peteghem.

The Kohlers argue, "In Georgia case law, the 'and/or' construction has been held to be ambiguous. The frequent use of 'and/or' in the verdict form forces both ambiguity in liability and uncertainty in damages in many of the findings. As a result the findings that use the 'and/or' construction are inappropriate for collateral estoppel." Defs.' Resp. at 15–16. In support, the Kohlers cite *Ralls v. E.R. Taylor Auto Co.*, 202 Ga. 107, 110, 42 S.E.2d 446, 448 (1947), as stating the "and/or" construction is ambiguous, and they cite *Brinson v. Ingram*, 120 Ga. App. 271, 271, 170 S.E.2d 39, 39 (1969), as stating the "and/or" construction is ambiguous as well as a defect of substance and form.  Those cases are legally inapposite and factually distinguishable. Both cases pertain to the sufficiency of statutorily required dispossessory affidavits and have nothing to do with jury verdict forms.

Moreover, and more to the point, the "and/or" construction creates potential ambiguity, not per se ambiguity. The jury eliminated the potential ambiguity by writing Xs next to each of the Kohler's names and writing a specific dollar amount for which each Kohler is liable.  The Final Judgment reflects a common-sense understanding of the Verdict which was not appealed: each Kohler is separately liable for $80,625 due to their separate liabilities for slander per se (in the amount of $5,375), invasion of privacy (in the amount of $26,875), and intentional infliction of emotional distress (in the amount of $48,375).

For the forgoing reasons, the Final Judgment is preclusive in this adversary proceeding as to an injury of $239,750.

### B.    Maliciousness

An injury is "malicious" when the debtor's actions are "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Maxfield v. Jennings (In re*

*Jennings)*, 670 F.3d 1329, 1163 (11th Cir. 1995) (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir. 1995)).

The Kohlers argue that none of their tort liability required a finding of malice. Defs.' Resp. at 14; Post-hearing Br. at 4–9**.** The Kohlers' liability, however, is based on a jury verdict and judgment on multiple tort claims. The Verdict and Final Judgment, as a matter of law, establish that the Kohlers' actions were wrongful and without just cause. Otherwise, they would not have been found to be liable in tort.[108]

### C.    Willfulness

An injury is "willful" when the debtor "commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir. 1995)).

The Kohlers argue that none of their tort liability required a finding of willfulness. Defs.' Resp. at 14; Post-hearing Br. at 4–9. It may be technically correct that a hornbook on tort law might not necessarily include "willfulness" as an element of the torts for which the Kohlers were found liable. It may also be technically correct that based on the jury instructions in the Superior Court Action (which will be discussed later), liability could have been imposed on a hypothetical defendant without a finding of intent to harm for some of the intentional torts at issue. This Court, however, does not consider this case in a vacuum.

The record in this case includes the trial transcript and the pleadings from the Superior Court Action, and the judgment in that action was based on that record. "[W]hen considering whether

---

[108] The Kohlers also dispute that they acted maliciously. The Court addressed above in § IV.B why this argument misses the mark. In short, the issue here is whether the Kohlers are precluded from disputing intent.

determination of an issue was a critical and necessary part of a judgment, a court should look to the entire record." *Loucks v. Smith (In re Smith)*, 537 B.R. 1, 11–12 (Bankr. M.D. Ala. 2015) (citing *Sunco Sales, Inc. v. Latch (In re Latch),* 820 F.2d 1163, 1166 (11th Cir. 1987)); *see also Ranger Const. Co. v. Robertshaw Controls Co.*, 158 Ga. App. 179, 180–81, 279 S.E.2d 477, 479–80 (1981) (looking to prior case's transcript to determine if collateral estoppel applied).

"An issue may be 'actually' decided even if it is not *explicitly* decided, for it may have constituted, logically, or practically, a necessary component of the decision reached in the prior litigation." *O'Rorke v. Porcaro (In re Porcaro)*, 545 B.R. 384, 400 (B.A.P. 1st Cir. 2016) (quoting *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30–31 (1st Cir. 1994)); *see also Hoult v. Hoult (In re Hoult)*, 243 B.R. 818, 823 (Bankr. M.D. Fla. 1999) ("An issue may be actually decided for purposes of collateral estoppel even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached.").

The record from the Superior Court Action clearly establishes that the Van Peteghems pleaded, tried, and argued their case based on intentional injuries. *See, e.g.*,

The Van Peteghems' Verified Answer & Counterclaim:
- ¶¶ 15–16, 18 (referring to "the Kohler's knowingly false accusations");
- ¶¶ 19–20 ("On March 11, 2009, the Kohlers began videotaping and photographing the Van Peteghems, their toddler children, their parents, and all guests in an intrusive fashion. The Kohlers did so with the specific intent to menace, harass, inflict emotional distress, and invade the privacy of the persons recorded.");
- ¶ 34 ("On March 16, 2009, Ms. Kohler intentionally broke a survey marker purchased by the Van Peteghems. Mr. Kohler Intentionally broke another survey marker the following day.");
- ¶ 38 ("… Mr. Kohler frivolously demanded a meeting with the Forsyth County Planning and Development Office to pursue [MPRA] issues against … the Van Peteghems, despite extensive documentation that all work performed at the Van Peteghem property was outside the relevant protected zone of the Chattahoochee.");
- ¶ 50 ("… Ms. Kohler began telling neighborhood children not to enter the Van Peteghem property or the deputies would come for them.");
- ¶ 52 ("In the summer of 2009, one of the Kohlers began blowing a trumpet late at night on the patio. One of the Kohlers aimed the trumpet at the Van Peteghem house and the windows of their

minor children. The Kohlers also began letting their dogs out at approximately 11:30 P.M., 1:30 A.M., 3:30 A.M., and 5:30 A.M. to bark most evenings throughout the year.");

- ¶ 55 (referring to Mrs. Kohler's "willful destruction of property markers");

- ¶ 57 (referring to the Kohler making numerous "knowingly false accusations with the specific intent to cause the Van Peteghems anguish, humiliation, and alienation within their community");

- ¶ 58 (referring to Mrs. Kohler "glar[ing] at Ms. Petegem [sic] with a silent, but palpable, seething hatred");

- ¶ 59 ("Ms. Kohler redirected the water in a knowing and intentional manner to rot the fence and destroy the trees ….");

- ¶ 60 ("After one neighbor suggested the Kohlers attempt to resolve their differences with the Van Peteghems, Ms. Kohler stated she would never do so.");

- ¶ 67 ("At approximately this time period, Ms. Kohler hid in bushes in the back of her property, ambushed Mr. Van Peteghem with a camera flash near his face, and ran away.");

- ¶¶ 75–76 ("The Kohlers performed the actions recited above to menace, harass, and inflict emotional distress on the Van Peteghems. The Kohlers intended for their campaign of harassment to psychologically harm the Van Peteghems.");

- ¶ 80 ("The Kohlers' actions in the commission of the tort of intentional infliction of emotional distress constituted willful misconduct so as to authorize an award of punitive damages. Accordingly, the Van Peteghems seek punitive damages to punish, penalize, and deter the Kohlers from such wrongful, malicious conduct in the future.");

- ¶¶ 101–103, 105, 107 ("The Kohlers made malicious, knowingly false statements about the Van Peteghems to fellow neighbors, acquaintances, neighborhood children, County officials, and various entities. The Kohlers complained to the HOA, the ARC, the County, and other entities, falsely accusing the Van Peteghems of violating various codes, regulations, and ordinances. The Kohlers falsely maligned the Van Peteghems to their neighbors to maliciously injure their reputation and to expose them to public hatred, contempt, and ridicule. … When the Kohlers made such statements, they knew them to be false and made such false accusations with the specific intent to harass the Van Peteghems and to inflict emotional distress. … The Kohlers' actions in the commission of the intentional torts of defamation, slander, and libel constituted willful misconduct so as to authorize an award of punitive damages. Accordingly, the Van Peteghems seek punitive damages to punish, penalize, and deter the Kohlers from such wrongful, malicious conduct in the future.");

- ¶ 128 ("Among the other actions described at greater length above, the Kohlers have unreasonably surveilled the Van Peteghems and their small children inside their home and yard. The surveillance was intended to frighten, torment, menace, and harass.");

The Van Peteghems' opening argument in the Superior Court Action:

- Trial Tr. 357:14–16 ("And the rest of the story, ladies and gentlemen, is going to be from the evidence that this has been a living nightmare for the Van Peteghems.");

- Trial Tr. 358:2–7 ("And little did they know that that would start a – what the evidence will be – a vicious and I mean vicious campaign by the Kohlers of yelling, screaming, of harassment, of taking photographs, of taking videos, of calling the Sheriff, of getting up  in the face of this person ….");

36

- Trial Tr. 358:14–21 ("[T]he county people … told the Kohlers that everything was appropriate, that there were no county ordinances or other ordinances violated. Despite knowing that and knowing early on the Kohlers continued to lodge complaints with everybody you can think of …….");
- Trial Tr. 363:15–20 ("That problem existed long before and is the responsibilities of the homeowner's association. The Kohlers knew that long before 2009. The Kohlers know it after 2009, yet with that knowledge they have continued to harass, photograph, scream, and yell at the Van Peteghems.");
- Trial Tr. 368:18–24 ("Despite all of these photographs that the Kohlers have taken, all of the video tapes, you will not see one single video of the runoff that was going on their property before all of this happened. You will not see that in any of the photographs of this ditch because even before this work was done that canyon was there, their problems existed.");
- Trial Tr. 370:3–7 ("Ultimately, you're going to hear about the privacy fence because the Kohlers were taking videos. Because the Kohlers were harassing, taking photographs the Van Peteghems finally had no choice but to put up a privacy fence and you're going to see that.");
- Trial Tr. 371:14–20 ("[W]hen [Matthew] Gravitt went over to … the Kohlers in March of '09, the Kohlers tried to get him to blame their septic problems on what the Van Peteghems had done. And Gravitt said, I'm not about to do that because that's not true.");

The direct examination and testimony of the Van Peteghems in the Superior Court Action:
- Trial Tr. 810:8–10 (direct examination and testimony of Mr. Van Peteghem):
  Q        [D]o you believe all of this, that you just described, was intentional upon the Kohlers?
  A        Absolutely, yes.

- Trial Tr. 1084:23–1085:6 (direct examination and testimony of Mrs. Van Peteghem):
  Q        After that [the March 13 incident] did the Kohlers keep filming and photographing your yard, you and your family?
  A        Constantly, constantly. … He would stand on his deck and film. He would stand on the manhole and film. He would reach the camera over – when we finally got the privacy fence in, he filmed. When Dirk was putting in the fence, she went out there and snapped him for almost two hours.

- Trial Tr. 1088:3–1089:4 (direct examination and testimony of Mrs. Van Peteghem):
  Q        [W]ere all those [referring to privacy measures] done based upon what the Kohlers had done to you?
  A        Yes, sir. Because they would stand here and point their cameras into our yard. He'd stand on the manhole, point the camera. He'd put … a ladder up against the fence, reach it over. He would go to the [neighbor's] deck without permission and film me from there. He would look up our driveway. He would film from the driveway. He filmed across the river. He filmed on our riverbank. He went to the bridge and filmed. He filmed from every spot.

  He put a large spy ladder in the woods and filmed from there. He put a spectators chair at the end of the line, sitting at our yard. They put a telescope

37

in their – in their deck right here aimed solely out there – so the only place that telescope could look is right at our yard, it was pointed straight down, not looking up, not looking anywhere else, right at our yard. Every time I come home. If I take out the compost I'm on film. Every time the boys and I would go outside and look for bugs, they're – kick a ball, I'm on film.

Every time we'd have play dates come over, we're on film. The ladies didn't want to come over any more. My son's birthday party, we're on film. The Easter egg hunt for two years in a row, we're on film, New Year's Day, going out and playing because papa has some time off, we're on film. My bathroom windows were on film.

Q        Has all that film been produced?

A        Not even a small fraction of that film has been produced. And in fact when we filed this and claimed about all the filming, what was produced was film that we had no idea had been taken.

- Trial Tr. 1115:4–1118:8 (direct examination and testimony of Mrs. Van Peteghem):

A        … And the letters never ended. One month it's a cease and desist that is completely manufactured allegations.

Then next month it's that my husband destroyed county property and augured through a storm drain. The next month it's that my septic is making their home habitable [sic]. …

The next month as we're leaving for the hospital to have the baby … it's another county visit that adds another, you know, we are obviously going to do something again, this time we cemented [the storm drain pipe] closed. …

Q        You were on your way to have your third child?

A        That's right. And she [referring to Mrs. Kohler] documents it in her diary, family in town and impending arrival coming. And boom, another county visit. I had – from the time this work was done to the summer I think the county had come 30 to 35 times. And that did not include the Public Health Department came, the county came, and I guess they're part of the county. The ARC [Architectural Review Committee], the HOA and it didn't stop.

…

Q         Were there other letters after that that Mr. Kohler wrote making false allegations?

A        Yes, sir. … They were letters to the Upper Chattahoochee River Keeper and to the Department of Natural Resources and to the Georgia Regional … Mountain Commission. The EPD, that we had deforested the riverbanks, that we had collapsed the riverbanks, they're up river, but somehow we collapsed the up riverbanks.

That we dumped silt in the Chattahoochee. That oh, that our fence is copper treated and this leaches in the ground and destroys the river. So we now are polluting the environment.

…

They wrote that we – that we deforested 45 percent of our property, I don't see how that's possible. …

> A letter to Commissioner Boff of Forsyth County. Oh, that we were building structures in the deep woods, right by the stream, by the river, within the buffer zones. We never built a structure. We never cleared a single tree. We never pulled a weed in the buffer zones.

Q     And were these all allegations made against you by Mr. Kohler?

A     Or Ms. Kohler, yes.

> …
>
> It never stopped. And you never – and because it was so completely fabricated, you – we never knew what would come next.

The Van Peteghems' closing argument in the Superior Court Action:

- Trial Tr. 1360:4–10 ("[T]his [case] is about the act of spying. … It got worse after the lawsuit was filed and we went to discovery and realized how much of their videotaping from inside their house and they didn't know it. It's freaky, it's disturbing.");

- Trial Tr. 1360:21–24 ("They had that telescope up on the deck pointing in their yard. They left it there, they left there as a reminder that we're always watching you. We are always watching you.");

- Trial Tr. 1361:14–16 ("This was a campaign of harassment, a deliberate and intentional campaign to make them feel exactly how they feel.");

- Trial Tr. 1362:11–17 ("You heard Mia talk about I'll be out in the yard by the boarder [sic] and Steve will come over and shake the tree branch over, you know, on his side of the property, but he'd shake the tree branch over her head so she know [sic] he was there. I'm watching you. I know you're out in your yard. The spying is creepy, it's disturbing.");

- Trial Tr. 1362:23–1363:1 ("[E]verything that [co-counsel] talked about, everything that I talked about has been part of this intentional campaign to make them feel the way they feel, severe, outrageous, severe emotional distress and you've got the evidence.").

The Kohlers' general defense to the Van Peteghems' counterclaims was that the counterclaims were retaliatory, were manufactured to complicate a simple drainage dispute, and were baseless for lack of injury.[109] In sum, Mrs. Kohler testified and they argued that the Van Peteghems themselves recorded the Kohlers and engaged in unreasonable, hostile gamesmanship and subtle intimidation, and that the Van Peteghems' asserted distress and fear were at odds with

---

[109] *See generally* Trial Tr. 1366:11–1393:16 (the Kohlers' closing argument). The Kohlers' closing argument referred to the Van Peteghems' counterclaims as "turn[ing] it into a huge fight," "smoke and mirrors," "[m]anufacturing a defense to a clear simple drainage claim," and a "retaliation counterclaim." Trial Tr. 1372:18–19, 1373:14, 1375:7–8, 1393:9. The Kohlers' attorney also argued that "the injury feigned by the [Van Peteghems] is just for your benefit." Trial Tr. 1374:21–22.

their behavior and demeanor as events played out.[110] The Kohlers did not rebut or contest the vast majority of the Van Peteghems' specific allegations regarding the Kohlers' actions, statements, and behavior, instead focusing almost exclusively on their own case-in-chief.[111]

Mrs. Kohler was the Kohlers' sole witness in their case-in-chief, and she was one of two rebuttal witnesses after the Van Peteghems rested. The other rebuttal witness—a friend and co-worker of Mrs. Kohler—testified to the Kohlers' property condition before and after the Van Peteghems completed their yardwork.[112] Her testimony did not rebut the allegations underlying the counterclaims, and in fact, she neither personally knew the Van Peteghems nor had seen the parties interact with each other.[113] Mr. Kohler did not testify at trial, which the Kohlers' attorney stated in closing argument was intended to avoid the Van Peteghems' attempt to complicate a simple drainage dispute.[114] At this Court's hearing on the Van Peteghems' motion for summary judgment, Mr. Kohler corroborated that the failure to contest the counterclaim allegations was indeed a trial strategy.[115]

In Mrs. Kohler's case-in-chief and rebuttal testimony, she generally contested the frequency and intent of the pictures and recordings attributed to them by the Van Peteghems. She also testified

---

[110] *E.g.*, Trial Tr. 414:4–12, 420:7–423:3 (direct examination and testimony of Mrs. Kohler); Trial Tr. 1205:2–1206:5 (direct examination and rebuttal testimony of Mrs. Kohler); Trial Tr. 1386:16–20 (the Kohlers' closing argument; "Now, when they get into court, they're telling you about all the emotional distress and the hardship of being photographed and, you know, this is just [sic] ruined our lives. But when it's actually happening out there, they find it to be amusing.").

[111] *See* Trial Tr. 378:13–535:13 (direct examination and testimony of Mrs. Kohler); Trial Tr. 1180:13–1187:25 (direct examination and rebuttal testimony of Zena Johnston); Trial Tr. 1198:5–1209:20 (direct examination and rebuttal testimony of Mrs. Kohler).

[112] Trial Tr. 1181:19–1184:11 (direct examination and testimony of Ms. Johnston).

[113] Trial Tr. 1186:14–1187:5 (cross examination and testimony of Ms. Johnston).

[114] Trial Tr. 1375:9–15 ("They want to focus on Steve Kohler not testifying. Well, that was a conscious decision that we made. Why did we do that? Because the Defendants want to make this a case of a neighborhood fight. The Defendants want to make it a personality conflict, it's a drainage case, it's not a personality conflict. It's not about behavior, it's about real consequences of water flowing.").

[115] Mr. Kohler stated, "What happened at the trial—and we'll, we have to take responsibility for this—what happened at the trial is we didn't, we, our, our attorney convinced us not to go down the road of the intentional torts. And to just, and not try to run that into a two week trial, which is what it would have taken to rebuke these intentional tort claims. There was plenty of evidence, unfortunately it wasn't shown." Audio of Nov. 14, 2016, hearing, at 2:33:56 P.M. to 2:34:22 P.M.

that the recordings were not intended to pry but rather to show the damage occurring to the Kohlers'
property, which was the other principal aspect of the Kohlers' defense.  She also suggested that the
Van Peteghems themselves engaged in hostile gamesmanship and subtle intimidation, openly
questioning the sincerity of the Van Peteghems' alleged fear and emotional distress. In particular, she
testified that several ostensibly intrusive recordings were accidental on her part, and potentially
resulted from Mrs. Van Peteghem "setting up" Mrs. Kohler.[116]

As noted later, in the section discussing the invasion of privacy claim, the jury necessarily
rejected or found irrelevant Mrs. Kohler's testimony on these points.

In sum, the Kohlers did not dispute, address, or explain the vast majority of allegations
underlying the counterclaims, and the allegations they did dispute were either necessarily resolved in
the Van Peteghems' favor or ultimately irrelevant. All this is to say that, while none of the
counterclaim jury instructions may have technically required a finding of intentional injury in a
vacuum, certain of the counterclaims—given the allegations, evidence, and argument put before the
jury—could only have been determined based on intentionally caused injuries. With this in mind, the
Court will now discuss each of the Van Peteghems' counterclaims.

### 1.  Intentional Infliction of Emotional Distress

For intentional infliction of emotional distress, the trial judge charged the jury as follows:
"One, who by extreme and outrageous conduct, intentionally or recklessly causes severe emotional
distress to another is subject to liability of such emotional distress."[117]

These instructions allow for a determination of liability based on recklessly caused injuries—

---

[116] Trial Tr. 420:7–423:2 (direct examination and testimony of Mrs. Kohler); Trial Tr. 1200:23–1206:5 (direct
examination and rebuttal testimony of Mrs. Kohler).
[117] Trial Tr. 1405:7–10.

the liability for which is dischargeable—as well as intentionally caused injuries. The Kohlers argue the jury could have based its liability finding on recklessness.  Post Hearing Br. at 8–9.

The Van Peteghems pleaded, tried, and argued this counterclaim as a campaign of harassment on the Kohlers' part, intended to harm the Van Peteghems.[118] The Van Peteghems' counterclaim for intentional infliction of emotional distress was never about the Kohlers disregarding a risk of harm. It was about the Kohlers forcing the Van Peteghems to live in front of a camera—even behind the Van Peteghems' privacy fence and in their own home—and about the numerous other actions, including baseless accusations, that defy an innocent explanation.

As already noted, with few exceptions, the Kohlers did not dispute in the Superior Court Action what the Van Peteghems said they did. Mrs. Kohler did testify, however, that the pictures and recordings were not intended to pry into the Van Peteghems' affairs. This testimony is primarily relevant to the invasion of privacy counterclaim (as further discussed below) but it is relevant to this counterclaim because the pictures and recordings were part of the campaign of harassment. In that sense, the Kohlers can be said to have contested this counterclaim, at least as to the pictures and recordings. The jury, as noted in the Court's discussion of the invasion of privacy claim, necessarily either rejected or found irrelevant the Kohlers' stated intent for the pictures and recordings.[119]

---

[118] *E.g.*, Verified Answer & Counterclaims ¶¶ 75–76, 80 ("The Kohlers performed the actions recited above to menace, harass, and inflict emotional distress on the Van Peteghems. The Kohlers intended for their campaign of harassment to psychologically harm the Van Peteghems. … The Kohlers' actions in the commission of the tort of intentional infliction of emotional distress constituted willful misconduct …."); Trial Tr. 810:8–10 (direct examination and testimony of Mr. Van Peteghem; Q: "[D]o you believe all of this, that you just described, was intentional upon the Kohlers?" A: "Absolutely, yes."); Trial Tr. 1361:14–16, 1362:23–1363:1 (Van Peteghems' closing argument; "This was a campaign of harassment, a deliberate and intentional campaign to make them feel exactly how they feel. … [E]verything that [co-counsel] talked about, everything that I talked about has been part of this intentional campaign to make them feel the way they feel, severe, outrageous, severe emotional distress and you've got the evidence.").

[119] The Court notes that (1) an intent not to pry is not mutually exclusive to (for example) an intent to make the Van Peteghems uncomfortable and (2) the stated intent for the pictures and recordings is irrelevant to the other conduct underlying this counterclaim, such as the persistent and apparently baseless accusations against the Van Peteghems.

The Kohlers did not otherwise specifically contest this counterclaim in the Superior Court Action, at least not in testimony. The Kohlers' attorney addressed the counterclaim in the Kohlers' closing argument, stating,

> Intentional infliction of emotional distress, the Judge is going to – a charge that has to be extreme and outrageous. It has to be severe emotional distress. Now, we don't think it was outrageous. He's also going to charge you on surveillance, that a party has a privilege to conduct surveillance in a lawsuit, which what [sic] was occurring here. But regardless of that there's no evidence of severe emotional distress. The facts are completely contrary. The Defendants basically set my clients up to make this claim.[120]

This is consistent with the Kohlers' general defense that the counterclaims were retaliatory, intended to complicate a simple water drainage dispute, and baseless. And it is consistent with the Kohlers' general refusal to deny the actions, behavior, and motivations attributed to them.

Given what was put before the jury, the jury could have only based its finding of intentional infliction of emotional distress on an intentionally caused injury. There is simply no basis in the record from the Superior Court Action that the Kohlers' conduct was reckless or that they did not intend to cause the resulting injury. The Kohlers, therefore, are precluded from arguing that their debt for intentional infliction of emotional distress is not a debt for a willful injury.

Accordingly, the Van Peteghems are entitled to judgment as a matter of law that the damages awarded to them against the Kohlers for intentional infliction of emotional distress in the Verdict and Final Judgment are non-dischargeable.

## 2.  Invasion of Privacy; Intrusion Upon Seclusion

The trial court charged the jury as follows on invasion of privacy (also referred to as intrusion upon seclusion):

---

[120] Trial Tr. 1388:22–1389:5.

> The tort of intrusion involves an unreasonable and highly offensive intrusion upon another's seclusion. Georgia law does not require physical intrusion to establish a claim of invasion of privacy. Georgia courts have extended that principle beyond physical intrusion to include prying and intrusions into private concerns.
>
> The unreasonable intrusion aspect of the invasion of privacy involves a prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns.
>
> Reasonable surveillance is recognized as a common method to obtain evidence for the use in a lawsuit. It is only when such is conducted in a vicious or malicious manner not reasonably limited and designated to obtain information needed for the lawsuit or deliberately calculated to frighten or torment the opposing party that the conduct constitutes an invasion of privacy.[121]

The Kohlers argue that the Verdict does not show a determination of their state of mind, that the Verdict does not specify which actions form the basis of the jury's finding, and that intent to harm is unnecessary for a finding of liability for this tort. Post Hearing Br. at 5–7.

The "overwhelming majority view of the case law" is that liability for intrusion upon seclusion is limited "to intentional intrusions." DAVID A. ELDER, PRIVACY TORTS § 2:2 (citing, in part, *Walker v. Whittle*, 83 Ga. App. 445, 64 S.E.2d 87 (1951), and *McDaniel v. Atlanta Coca-Cola Bottling Co.*, 60 Ga. App. 92, 2 S.E.2d 810 (1939)). "[T]he intrusion tort is generally considered purely intentional"—liability cannot be based on recklessness. DAVID A. ELDER, PRIVACY TORTS § 2:3 (citing RESTATEMENT (SECOND) OF TORTS § 652B)); *see also Anderson v. City of Columbus*, 374 F. Supp. 2d 1240, 1255 (M.D. Ga. 2005) ("The parties agree that such intrusion must be intentional. … [T]he Court finds that since there is no evidence of his intent, he is entitled to summary judgment on this claim, also."); RESTATEMENT (SECOND) OF TORTS § 652(B) cmt. a. ("The form of invasion of privacy covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in

---

[121] Trial Tr. 1406:11–1407:3.

solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.").

While the jury instructions do not specify a particular mental state, the jury instructions are relevant only if the Court must look behind the Final Judgment to determine its preclusive effect. Here, the Court need not look behind the Final Judgment. As a matter of law, an intentional intrusion is an element of the tort of intrusion upon seclusion. The judgment for intrusion upon seclusion is conclusive as to the Kohlers' intent to intrude—that is, their intent in injure.

Alternatively, the Court could reach the same conclusion by looking behind the Final Judgment to the evidence and arguments on which the jury found liability.

The recordings and pictures were at the heart of the campaign of harassment. In the Superior Court Action, the Van Peteghems testified at length regarding the Kohlers' recordings, pictures, and other intrusive behavior.[122] An adequate summary here of their testimony is impracticable. The general tenor of the testimony is that over a period of several years, the Van Peteghems could not leave their house, do yardwork, play outside with their children, or even entertain houseguests without the Kohlers being somewhere nearby with a camera.[123]

---

[122] *See* Trial Tr. 747:3–22, 778:15–780:4, 806:8–810:3 (direct examination and testimony of Mr. Van Peteghem); Trial Tr. 1086:14–1090:17, 1096:19–1097:5, 1113:12–1115:4, 1125:6–1141:12 (direct examination and testimony of Mrs. Van Peteghem).

[123] The following portion of Mrs. Van Peteghem's testimony is representative:

> Because they would stand here and point their cameras into our yard. He'd stand on the manhole, point the camera. He'd put … a ladder up against the fence, reach it over. He would go to the [neighbor's] deck without permission and film me from there. He would look up our driveway. He would file from the driveway. He filmed across the river. He filmed on our riverbank. He went to the bridge and filmed. He filmed from every spot. He put a large spy ladder in the woods and filmed from there.
>
> He put a spectators chair at the end of the line, sitting at our yard. They put a telescope in their – in their deck right here aimed solely out there – so the only place that telescope could look is right at our yard, it was pointed straight down, not looking up, not looking anywhere else, right at our

The Kohlers did not contest that they recorded and took pictures. They did, however, contest the alleged frequency, amount, and intent of the pictures and recordings. Mrs. Kohler testified that the Kohlers used cameras merely to document damage to their property as it was occurring and did not intend to pry (i.e., their surveillance was reasonable).[124] Consistent with their general defense that the counterclaims were retaliatory and manufactured, the Kohlers also disputed any damages.[125] But as already noted, the Kohlers' primarily defended against the counterclaims by ignoring them, leaving numerous allegations unrebutted.  The Kohlers failed to address, for example, the Van Peteghems' testimony that the Kohlers evaded the Van Peteghems' privacy measures by several means, including by reaching over the privacy fence with a camera, by using a camera from a ladder in the woods, and by using a camera from another neighbor's deck.  The Kohlers failed to address

---

yard. Every time I come home. If I take out the compost I'm on film. Every time the boys and I would go outside and look for bugs, they're – kick a ball, I'm on film.

Every time we'd have play dates come over, we're on film. The ladies didn't want to come over any more. My son's birthday party, we're on film. The Easter egg hunt for two years in a row, we're on film, New Year's Day, going out and playing because papa has some time off, we're on film. My bathroom windows were on film.

…

Not even a small fraction of that film has been produced. And in fact when we filed this and claimed about all the filming, what was produced was film that we had no idea had been taken.

Trial Tr. 1088:5–1089:9; *see also* Trial Tr. 1133:16–19 (testimony of Mrs. Van Peteghem; "We were filmed almost daily, doing daily activities in the sun, not after a rain. In dry conditions in our yard having nothing to do with anything, we were filmed constantly. We rarely go outside.").

[124] Trial Tr. 420:12–421:5 (direct examination and testimony of Mrs. Kohler; stating the Kohlers videotaped when damage occurred and had no intent to pry); Trial Tr. 1202:1–1204:2 (direct examination and rebuttal testimony of Mrs. Kohler, generally disputing the amount and frequency); Trial Tr. 1389:1–6 (the Kohlers' closing argument; "He's also going to charge you on surveillance, that a party has a privilege to conduct surveillance in a lawsuit, which what was occurring here.").

[125] Trial Tr. 422:25–423:2 (testimony of Mrs. Kohler; "And then the next thing we do is we get a counterclaim accusing us of this, of videotaping the children. I mean, Maybe I was being set-up, I don't know."); Trial Tr. 1204:2 (rebuttal testimony of Mrs. Kohler, again referring to "being set up"); Trial Tr. 1373:14 (the Kohlers' closing argument, referring to this counterclaim as "all smoke and mirrors"); Trial Tr. 1386:16–20  (the Kohlers' closing argument; "Now, when they get into court, they're telling you about all the emotional distress and the hardship of being photographed and, you know, this is just ruined our lives. But when it's actually happening out there, they find it to be amusing."); Trial Tr. 1389:1–6 (the Kohlers' closing argument; "He's also going to charge you on surveillance, that a party has a privilege to conduct surveillance in a lawsuit, which what was occurring here. But regardless of that there's no evidence of severe emotional distress. The facts are completely to the contrary. The Defendants basically set my clients up to make this claim.").

testimony that they appeared to be taking pictures and recordings on dry days and of situations having nothing to do with water runoff. And of course, having not testified, Mr. Kohler failed to address any allegations about his behavior and intentions.

In finding for the Van Peteghems on this claim, the jury rejected the Kohlers' reasonable surveillance defense.   In doing so, the jury necessarily found that (1) the Kohlers conducted the surveillance in a vicious or malicious manner not reasonably limited and designated to obtain information needed for the lawsuit or (2) the surveillance was deliberately calculated to frighten or torment the  Van Peteghems. No Georgia cases construe "vicious or malicious manner." Oxford Dictionaries defines "vicious" as being "deliberately cruel or violent."[126] One of the few Georgia cases on reasonable surveillance defines "malice" as "a motive to harm the plaintiff by the activity engaged in." *Pinkerton Nat'l Detective Agency, Inc. v. Stevens*, 108 Ga. App. 159, 166, 132 S.E.2d 119, 124 (1963).[127] So as a matter of law, either (1) the Kohlers were deliberately cruel or motivated to harm in their surveillance or (2) the Kohlers' surveillance was deliberately calculated to frighten or torment the Van Peteghems. In other words, the jury necessarily found intent to harm.

The Kohlers, therefore, are precluded from arguing that their debt for intrusion upon seclusion is not a debt for a willful injury. Accordingly, the Van Peteghems are entitled to judgment

---

[126] *Vicious*, OXFORD DICTIONARIES, https://en.oxforddictionaries.com/definition/vicious (first definition) (last visited Mar. 8, 2017).

[127] Generally, "malicious" as used in Georgia tort law does not mean the same as when used in § 523(a)(6). "Malice" is defined for the tort of abusive litigation as "acting with ill will or for a wrongful purpose." O.C.G.A. § 51–7–80. "Malice" for purposes of the tort of willful or malicious failure to guard or warn against a dangerous condition (*see* O.C.G.A. § 51–3–25) "requires either an actual intent to cause the particular harm produced or the wanton and willful doing of the act with an awareness of the plain and strong likelihood that harm may result." *Stone Mountain Mem'l Ass'n v. Amestoy*, 337 Ga. App. 467, 470, 788 S.E.2d 110, 113 (2016) (quotation marks and brackets omitted). And of course, the *Pinkerton* case cited in the text offers yet another definition that differs from how the term is used in § 523(a)(6).

as a matter of law that the damages awarded to them against the Kohlers for intrusion upon seclusion in the Verdict and Final Judgment are non-dischargeable.

### 3. Defamation/Slander Per Se[128]

The Van Peteghems alleged and testified to numerous false accusations and false reports that one or both of the Kohlers made to Forsyth County, the HOA, other entities, and neighbors. The trial transcript, however, establishes that the slander per se claim went to the jury only on the Kohlers' accusation that the Van Peteghems augured through a drainage pipe—an accusation of criminal destruction of property.[129] Imputation of a crime constitutes slander per se. The jury was charged on slander per se as follows:

> Slander, ladies and gentlemen of the jury, I charge you that slander per se consists of imputing to another a crime punishable by law. In a case of slander per se, damage is inferred.
> I'll now charge you on privileged communications. Ladies and gentlemen, certain statements are deemed privileged under the law. Statements made with a good-faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned constitutes privileged communications.
> I charge you that in every case of privilege communications, if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action.[130]

The Kohlers argue that the Verdict does not show a determination of their states of mind, that the Verdict does not specify which actions form the basis of the jury's finding, and that liability for this tort does not require an intent to harm. Post Hearing Br. at 4–5. The Kohlers, however, overlook the evidence and argument on which the jury found liability.

---

[128] These terms were used interchangeably in the Superior Court Action.

[129] *See* Trial Tr. 1218:24–1221:17 (the Kohlers' motion for directed verdict on defamation); Trial Tr. 1226:2–19 (the Van Peteghems' argument opposing the motion for directed verdict); Trial Tr. 1240:10–1241:5 (the Kohlers' response argument); Trial Tr. 1309:7–1313:8 (the Superior Court's ruling, culminating with, "At this time, I'm going to allow only the slander per se regarding the destruction of property as far as this pipe."); Trial Tr. 1356:12–1357:3 (the Van Peteghems' closing argument on slander per se).

[130] Trial Tr. 1405:11–25.

In their closing argument, the Kohlers did not really dispute that slander occurred but rather argued lack of damages,[131] which is consistent with their argument that the counterclaims in general were retaliatory and manufactured.[132] The Kohlers did not introduce evidence on the matter. The Kohlers did not dispute or otherwise address the testimony that that the accusation at issue—the falsity of which was corroborated by Mr. Gravitt's testimony—was one of many "lies" about the Van Peteghems to perpetuate the campaign of harassment.[133]   Accordingly, and consistent with the verdicts already discussed, the jury rejected the notion that the Kohlers' had a good-faith intent to protect their interest when they accused the Van Peteghems of auguring through the drainpipe. The jury rejected that notion, of course, because it had already found that the slander was one of the intentional harms forming the campaign of harassment. Because the jury rejected the defense that the statement was made in good faith, the only alternative is that it was made with the intent to injure.

The Kohlers, therefore, are precluded from arguing that their debt for slander per se is not a debt for a willful injury.  Accordingly, the Van Peteghems are entitled to judgment as a matter of law

---

[131] The Kohlers' attorney, at closing, argued as follows (at Trial Tr. 1389:7–24) (emphasis added):

> Defamation, the Judge is going to charge you that there is a  – the law is that you make a charge of a criminal act you can be held for – liable for defamation without showing any type of special damage. Well, let's think about that, **who did they defame them to**? The only people they talked to are the county, who has a duty to come out there and look at the problem, and the HOA. They can't show anybody thought less of them.
> What defamation is it's a disparagement that affects your reputation so that if you're talked bad about it hurts your reputation. Well, I asked Mr. Zimmerman and Mr. Bridges if they – these types of questions, particularly Mr. Bridges, and he said, no, I didn't think anything less of them because I, you know, and then he went on to explain because basically I didn't know what the condition of the Van Peteghem yard was before. He didn't think less of them, **it didn't hurt their reputation at all.**

[132] *See, e.g.*, Trial Tr. 1372:2–1373:6 (the Kohlers' closing argument, comparing the Van Peteghems' counterclaims to "the number of counterarguments that were used to attack the prosecution" in the OJ Simpson murder trial, with the result that "a killer went free"; further stating, "They want to file a counterclaim. They don't really tell you how they were damaged. They won't tell you an amount, why is that, because it's embarrassing to ask for money for these counterclaims. … It's retaliation. It's the best defense to a clear claim that you know that your water is – is helping to cause a traumatic entry to our neighbor is simply to start fighting against them, counterclaim.").

[133] Trial Tr. 800:23–801:1, 804:3–805:6 (direct examination and testimony of Mr. Van Peteghem).

that the damages awarded to them against the Kohlers for slander *per se* in the Verdict and Final Judgment are non-dischargeable.

### 4.   Assault and Battery

The verdicts for assault and battery stem from the March 13, 2009, incident when Mr. Kohler berated Mrs. Van Peteghem at such close proximity that Mr. Kohler's saliva landed on Mrs. Van Peteghem.[134]

The judge in the Superior Court Action directed a verdict on the battery claim, finding "there is no evidence other than the evidence that the battery did occur."[135]   As to assault, the trial judge charged the jury as follows: "I charge you that a person commits the tort of assault when he intentionally commits an act which places another in reasonable apprehension of immediately receiving a violent injury."[136]

The Court of Appeals of Georgia reversed the battery directed verdict, stating,

> Based on the entirety of Mrs. Van Peteghem's testimony about her encounter with Mr. Kohler, it is somewhat ambiguous whether Mr. Kohler intended to spit in her face during the heated encounter, or whether errant spit accidentally landed on her face as he yelled at her. Either inference could have been drawn by the jury. Furthermore, the testimony of the former president of the homeowners' association, construed in the light most favorable to the Kohlers, could have led the jury to find that Mr. Kohler was not "one-on-one against" Mrs. Van Peteghem but instead was heatedly "expressing his point of view" among a circle of people standing in the street, which would call into question whether the spitting was intentional. Accordingly, because the evidence and all reasonable inferences drawn from it did not *demand* a finding that Mr. Kohler intentionally spat on Mrs. Van Peteghem and thus committed a battery, the trial court erred in granting the motion.
> …
> [W]e conclude that there was at least some evidence in the record from which the jury could have found that Mr. Kohler accidentally spat on Mrs. Van Peteghem and never physically touched her during the encounter.

*Kohler v. Van Peteghem*, 330 Ga. App. 230, 236–37, 767 S.E.2d 775, 780–81 (2014).

---

[134] Trial Tr. 805:10–806:2 (direct examination and testimony of Mr. Van Peteghem explaining that the counterclaims for assault and battery relate to the spitting incident); Trial Tr. 1242:22–25 (oral ruling on motion for directed verdict on battery); Trial Tr. 1357:4–22 (the Van Peteghems' closing argument on assault and battery).
[135] Trial Tr. 1242:23–24.
[136] Trial Tr. 1406:1–4.

The Van Peteghems thereafter voluntarily dismissed, without prejudice, the battery counterclaim.[137] The directed verdict being reversed and the battery claim being dismissed, there is no battery judgment in favor of Mrs. Van Peteghem. Accordingly, the Final Judgment has no preclusive effect in this action as to battery.

The Kohlers argue that the battery directed verdict could have influenced the jury's finding of assault such that the assault portion of the Verdict and Final Judgment should not be preclusive in this proceeding. Defs.' Resp. at 20.[138] This argument goes to the validity of the assault portion of the Final Judgment and to Mr. Kohler's liability for assault. As discussed above, the Kohlers are precluded in this proceeding from contesting the liability imposed by the Final Judgment (except the battery portion of the Final Judgment).

Mr. Kohler also argues that the Verdict's findings on assault do not show a determination of his state of mind, that the Verdict does not specify which actions form the basis of the jury's finding, and that intent to harm is unnecessary for a finding of liability. Post Hearing Br. at 7–8. The Court agrees with Mr. Kohler that the assault portion of the Verdict and Final Judgment is not preclusive as to intent to injure. The jury instructions allow for liability based on an intentional act that merely

---

[137] Plaintiffs' Status Report [Doc. 30]; Defendants' Status Report [Doc. 31].

[138] At the hearing on the Van Peteghems' Motion for Summary Judgment, the Van Peteghems' attorney stated that the Kohlers made this argument—and lost—on appeal of the Final Judgment. Audio of Mot. Summ. J. Hearing, at 2:08:24 P.M. to 2:08:49 P.M. ("So there's a real res judicata issue in arguing that the battery claim infected the rest of the verdict or infected the jury's finding on these other intentional torts because they argued that in the court of appeals. They said, 'Look, we should get a new trial because the directed verdict, you know, could have been the basis for these other things.' And the Court of Appeals heard that argument and said 'No.'").

    The opinion of the Court of Appeals suggests the Kohlers appealed a different, albeit similar, issue: "The Kohlers also argue that the trial court erred in charging the jury that Mr. 'Kohler's action of spitting on Mrs. ... Van Peteghem constituted a battery under the laws of Georgia.' The Kohlers further argue that the charge on the spitting incident was so 'incendiary' that it poisoned the jury's deliberations, necessitating the grant of a new trial on all of the claims and counterclaims raised in the case." *Kohler v. Van Peteghem*, 330 Ga. App. at 238, 767 S.E.2d at 781. In other words, the Kohlers argued on appeal that the trial court's "incendiary" language on battery infected the Verdict in whole—not that the directed verdict itself affected the finding on assault. The difference is irrelevant to the Court's analysis.

causes injury, that being Mrs. Van Peteghem's reasonable apprehension of immediately receiving a violent injury, which focuses on her state of mind, rather than an act Mr. Kohler actually intended to cause injury, which would focus on his state of mind. The evidence in the Superior Court Action on this claim is not as conclusive as with some of the other claims. Although Mr. Kohler's actions in this incident appear to have been part of his overall campaign to harass and intimate the Van Peteghems, it is not conclusive - as a matter of law - that he intended for Mrs. Van Peteghem to feel that she was being threatened with "immediately receiving a violent injury." As the Court of Appeals noted in reversing the battery directed verdict, the evidence is somewhat ambiguous on Mr. Kohler's intent during the March 13, 2009 incident. The jury could have found that Mr. Kohler's intentional acts merely caused—rather than were intended to cause—Mrs. Van Peteghem to reasonably apprehend immediately receiving a violent injury.

Mr. Kohler, therefore, is not precluded from arguing that his debt for assault is not a debt for a willful injury. Accordingly, Mrs. Van Peteghem is not entitled to judgment as a matter of law that the damages awarded to her against Mr. Kohler for assault in the Verdict and Final Judgment are non-dischargeable.

### 5. Trespass, Nuisance, and Destruction of Property

These claims relate to the Kohlers obstructing and redirecting the natural flow of water onto the Van Peteghems' property, causing surplus water on the Van Peteghems' property and death to vegetation and trees. The claims also relate to the Kohlers destruction of certain property markers

belonging to the Van Peteghems.[139] These claims went to the jury as a single claim for general

damages for "trespass, nuisance, and destruction of property."[140]

The jury was charged in relevant part as follows:

> At this time, I'll charge you on nuisance. A nuisance is anything that causes hurt, inconvenience, or damage to another. The fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful or should or such would affect only one of extraordinary or demanding taste, but it shall be one or such as would affect an ordinary, reasonable person.
>
> The privilege and use incident to the right of property must not be exercised in an unreasonable manner so as to inflict injury upon another unnecessarily. To constitute a nuisance, the use must be such as to produce actual, tangible, and substantial injury to neighboring property or such as to interfere sensibly with its use and enjoyment per person of ordinary sensibilities.
>
> …
>
> A party is liable if it caused or was a concurrent cause or the creation, continuance, or maintenance of a condition causing annoyance and inference [sic] with the use of private property.
>
> Members of the jury, I charge you that surface-water invasion by itself does not show that a tort has taken place. When a surface-water invasion has taken place, whether it amounts to a compensable tort is a question of fact for your determination. Nature, gravity, velocity, and relativity, as well as acts of the parties to reduce the flow of water are matters that must be considered in determining whether a surface-water invasion constitutes a trespass for which damages are recoverable.
>
> Members of the jury, I charge you with where two lots adjoin, the lower lot owes a servitude to the higher, so far as to receive the water which naturally runs from it, provided the owner of the latter has done no act to increase such flow by artificial means.
>
> …
>
> The diverting of water in whole or in part from its natural and usual flow, or the obstructing thereof, so as to impede its course or cause it to overflow or injury [sic] the land through which it flows is not permitted.
>
> …
>
> I'll now charge you on damage to trees. Every person, firm, or corporation who, without the written consent of the person holding legal title to land or to an

---

[139] Trial Tr. 795:4–799:24 (direct examination and testimony of Mr. Van Peteghem on the claim for "trespassing nuisance" resulting from the redirection of water); Trial Tr. 800:6–800:22 (direct examination and testimony of Mr. Van Peteghem regarding claim for destruction of personal property); Trial Tr. 1352:18–1356:3 (the Van Peteghems' closing argument on trespass, nuisance, and destruction of personal property).

[140] *See* Verdict at 2; *see also* Trial Tr. 1355:21–1356:7 (the Van Peteghems' closing argument on these claims; explaining that the Van Peteghems are requesting general damages and not special damages).

> interest in land as a security for debt, as shown by the public record of the county where the land is located, buys, sells, cuts, removes, holds, disposes of, changes the form of, or otherwise converts to the use himself, itself, or another any trees growing or grown on such land shall be liable to the holder of the legal title for such trees, in any form, bought, sold, cut removed [sic], held, disposed of, changed in form, or otherwise converted by him or it, or for the value of such trees.[141]

This charge is silent on mental state and is limited to trespass involving and destruction caused by water.

For certain of these claims, the Kohlers' mental states were irrelevant. It only mattered for certain of them that what they did caused an injury. Moreover, it is unclear which act or acts formed the basis of the Verdict on this category of claims, which is important because based on the evidence, the jury could have found for the Van Peteghems based on acts not intended to injure. For example, the water was redirected onto the Van Peteghems' property by rocks, mondo grass, and plastic edging that the Kohlers had installed.[142] Mrs. Kohler testified that the Kohlers took these steps after researching "best management practices" for remediating water runoff[143] and after taking seminars on managing water runoff.[144] She also testified that the Kohlers intended to redirect the water onto the easement between the parties' properties.[145]

Because the jury could have found liability on some these claims without finding intent to harm, and the Verdict does not state on which of these claims liability was based, the trespass, nuisance, and destruction of property portion of the Verdict and Final Judgment are not preclusive in this proceeding as to intent to harm. Accordingly, the Van Peteghems are not entitled to judgment as

---

[141] Trial Tr. 1401:22–1402:11, 1402:19–1403:13, 1404:1–4, 1404:19–1405:5.

[142] *E.g.*, Trial Tr. 1012:18–1013:7 (direct examination and expert testimony of Phillip Craig).

[143] Trial Tr. 409:25–410:9, 418:8–18 (direct examination and testimony of Mrs. Kohler); Trial Tr. 1207:17–25 (direct examination and rebuttal testimony of Mrs. Kohler).

[144] Trial Tr. 1207:25–1208:3 (rebuttal testimony of Mrs. Kohler).

[145] Trial Tr. 1208:8–9 (rebuttal testimony of Mrs. Kohler).

a matter of law that the damages awarded to them against the Kohlers for trespass, nuisance, and

destruction of property in the Verdict and Final Judgment are non-dischargeable.

### 6.  Punitive Damages

In a separate claim for punitive damages, and the jury found that the Kohlers acted "with the

specific intent to cause harm" to the Van Peteghems. The jury awarded the Van Peteghems $500 on

this claim.[146] An injury resulting from a specific intent to cause harm is an intentionally caused

injury; i.e., the injury results from "an intentional act the purpose of which is to cause injury."

*Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012).

The Kohlers argue that the punitive damages should not be non-dischargeable as a matter of

law because the jury might have awarded it based on the acts underlying the battery judgment, which

has been reversed and remanded, and which underlying claim has since been dismissed. Defs.' Resp.

at 22, 24. This argument fails for three reasons. First, the Court need not speculate about which

claim(s) the punitive damages are tied to. The jury awarded $500 because of the Kohlers' specific

intent to cause harm. Or to put it in "willfulness" terms, the $500 is attributable to Kohlers acting

with the purpose to cause injury. The Kohlers are precluded from arguing that the $500 is

attributable to a non-willful injury.

Second, even assuming such speculation was warranted, the Court would conclude that the

punitive damages are not attributable to the battery portion of the Final Judgment. The punitive

damages were *not* reversed on appeal—the $500 award is part of the total $239,750 liability that is

---

[146] The finding on punitive damages is with the other jury findings in the Verdict, but the amount of the award is not. The $500 award is on a separate, one-page verdict attached to the Verdict because the award of punitive damages was during the second phase of the trial after the Jury Verdict was announced on the counterclaims. *See* Verdict at 5. The award is not stated separately in the Final Judgment; rather, the Final Judgment refers to a judgment for $35,500 which comprises the $500 punitive damages award and the $35,000 attorney fee award.

enforceable as a valid judgment under Georgia law. The Court must assume the punitive damages are attributable to claims whose judgments were upheld on appeal.

Third, the battery judgment was awarded in favor of only Mrs. Van Peteghem and only against Mr. Kohler, whereas the judgment for punitive damages was awarded to both of the Van Peteghems and against both of the Kohlers, jointly and severally.  If the punitive damages were awarded on account of the battery claim, Mrs. Van Peteghem would have been awarded more than Mr. Van Peteghem, and Mr. Kohler would have been found liable for a larger amount than Mrs. Kohler.[147]

The punitive damages portion of the Final Judgment, therefore, is a debt for a willful injury and thus entitled to preclusive effect in this proceeding. Accordingly, the Van Peteghems are entitled to judgment as a matter of law that the punitive damages awarded to them against the Kohlers in the Verdict and Final Judgment are non-dischargeable.

### 7.  Attorney's Fees

The jury found for the Van Peteghems on their claim for attorney's fees, awarding the Van Peteghems $35,000. "An award of attorney's fees in connection with a debt that is non-dischargeable is likewise non-dischargeable." *Flemm v. Trexler (In re Trexler)*, No. 14-52495-WLH, 2016 WL 236054, at *9 (Bankr. N.D. Ga. Jan. 11, 2016) (citing *Cohen v. De la Cruz*, 523 U.S. 213 (1998)). When a judgment imposes both non-dischargeable and dischargeable liabilities, bankruptcy courts generally apportion the single fee award to the non-dischargeable and dischargeable components of

---

[147] The same argument could be applied to whether the punitive damages were awarded based on the assault claim. Also, the Court notes it would not help the Kohlers if they were to argue that the punitive damages could have been awarded in response to the assault, trespass, nuisance, and destruction of property claims—the claims this Court has declined to find to be non-dischargeable as a matter of law.   If the Court were to assume that they were awarded as part of those claims, the finding of a specific intent to cause harm would be sufficient to make the Final Judgment on those claims non-dischargeable as a matter of law.

the judgment, prorated accordingly. *See, e.g.*, *id.* The Court will similarly apportion here, but because the Court is ruling in the summary judgment context, the Court will apportion the fee award between the components of the Final Judgment on which the Court has granted summary judgment and to the components for which the Van Peteghems have not met their burden on summary judgment.

The Verdict and Final Judgment are preclusive in this proceeding as to the Van Peteghems' claims for intentional infliction of emotional distress,[148] invasion of privacy,[149] slander per se, and punitive damages.[150] The Kohlers' liability for those claims is $161,750.

The Verdict and Final Judgment are not preclusive as to the claims for trespass, nuisance, and destruction of property,[151] assault,[152] and battery.[153] The Kohlers' liability for these claims is $53,750.

The Kohlers' total liability under the Final Judgment, excluding the attorney's fees award, is $215,500. Of that, 75.058% is attributable to liabilities subject to the partial grant of summary judgment. The portion of the attorney's fees award also subject to the partial grant of summary judgment, therefore, is $26,270.30.

## CONCLUSION

Based on the forgoing, it is hereby

---

[148] For this claim, the Final Judgment imposes a $48,375 liability on Mr. Kohler and a separate $48,375 liability on Mrs. Kohler.

[149] For this claim, the Final Judgment imposes a $26,875 liability on Mr. Kohler and a separate $26,875 liability on Mrs. Kohler.

[150] For this claim, the Final Judgment imposes a $5,375 liability on Mr. Kohler and a separate $5,375 liability on Mrs. Kohler.

[151] For these claims, the Final Judgment imposes a $10,750 liability on Mr. Kohler and a separate $10,750 liability on Mrs. Kohler.

[152] For this claim, the Final Judgment imposes a $21,500 liability on Mr. Kohler to Mrs. Van Peteghem.

[153] For this claim, the Final Judgment imposes a $10,750 liability on Mr. Kohler to Mrs. Van Peteghem.

ORDERED as follows:

1.  The Van Peteghems are entitled to judgment as a matter of law that the judgment they obtained against the Kohlers with respect to their claims for intentional infliction of emotional distress, slander per se, invasion of privacy/intrusion by seclusion, and punitive damages is non-dischargeable pursuant to § 523(a)(6);

2. The Van Peteghems are entitled to judgment as a matter of law that the judgment they obtained against the Kohlers with respect to their claim for attorney's fees is non-dischargeable pursuant to § 523(a)(6) in the amount of $26,720.30, with interest at the legal rate as provided by the laws of the State of Georgia, and the non-dischargeability of the balance of the attorney's fees awarded shall be determined after trial and further order of the Court;

3. The Van Peteghems are not entitled to judgment as a matter of law that the judgment they obtained against Kohlers with respect to their claim for trespass, nuisance and damage to property is non-dischargeable pursuant to § 523(a)(6), and the non-dischargeability of those claims shall be determined after trial and further order of the Court;

4. Mrs. Van Peteghem is not entitled to judgment as a matter of law that the judgment she obtained against Mr. Kohler with respect to her claim for assault is non-dischargeable pursuant to § 523(a)(6), and the non-dischargeability of that claim shall be determined after trial and further order of the Court; and

5. If the Van Peteghems file a notice of dismissal of that portion of this adversary proceeding concerning the dischargeability of the claims for assault, trespass, nuisance, damage to property, and the balance of the attorney's fees, this Court will enter a final judgment in their favor with respect to the claims found to be non-dischargeable in this Order without further trial or hearing.

[END OF DOCUMENT]